UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

    SPENCER DREIER,

        Plaintiff,

        v.

    BEN CLORITE,

        Defendant.

------------------------------------------------------x

    09 Civ. 7553 (JGK) (MHD)

**PLAINTIFF'S MEMORANDUM IN OPPOSITION
TO DEFENDANT'S MOTIONS IN LIMINE**

Plaintiff Spencer Dreier ("Dreier"), appearing pro se, respectfully submits this Memorandum in opposition to the Motions in Limine submitted by Defendant and Counterclaimant Ben Clorite ("Clorite") on June 18, 2012.


I.  Insurance Coverage

Clorite asks that the Court direct Dreier not to mention in the presence of the jury that "insurance is involved in any way in the payment of defense expenses."  He cites in particular the insurance coverage of a portion of his attorneys' fees.  He does not address the admissibility of evidence that there is also coverage of compensatory damages on the claims themselves (as indicated in the insurance policy which Clorite produced).  In any event, while Dreier recognizes that evidence of insurance coverage is inadmissible for some purposes, it is not inadmissible for all purposes.

Here the fact of insurance coverage is relevant and should be admissible in respect of the jury's consideration of awarding punitive damages against Clorite.

It is widely recognized that a defendant's financial circumstances are a factor to be considered in the determination of what amount, if any, to award as punitive damages. BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589.  Certainly, if a jury has awarded compensatory damages in an amount that it believes will cause financial hardship to Clorite, that will be a factor in their assessment of his financial circumstances when considering punitive damages.  The jury, therefore, cannot fairly assess Clorite's financial circumstances for purposes of determining punitive damages if it is under the mistaken impression that whatever compensatory damages it has awarded will be borne by him personally when in fact it will be borne by his insurer.  The same is true if they incorrectly assume that Clorite is paying all of his attorneys' fees. In the same way that a jury should not be left with the impression that he has insurance in considering compensatory damages, it should not be left with the impression that he doesn't have insurance in considering punitive damages.

Therefore, Dreier should be entitled to present evidence of insurance coverage for the limited purpose of the jury's consideration of punitive damages.  The jury can be given a limiting instruction.  Just as defense counsel presumably will present evidence that Clorite is financially limited or young or unemployed to suggest that punititive damages should be minimized, Dreier should be able to show his insurance coverage for this

litigation to enable the jury to understand his actual financial posture and the impact that an award of punitive damages will have on him.

II.   Testimony of Officer Allen Gerard

Dreier has designated Lt. Allen Gerard ("Gerard") as a trial witness, either by deposition or by live testimony (if subject to subpoena).   Gerard is a police officer of 33 years experience in Madison, Connecticut, where Clorite resides.  He has relevant testimony regarding a police incident involving Clorite on August 27, 2008.  Defense counsel asks the Court to preclude Dreier from offering Gerard's testimony or the related Case Incident Reports.  He does so based on an entirely incomplete and misleading explanation to the Court as to what occurred and what the evidence would be.

Thus, defense counsel describes the incident as a "tussle" between Gerard and Clorite's father, resulting in the arrest of his father.  While it is true that his father was arrested during this incident on the charge of "Interfering with an Officer," defense counsel knows very well that the point of Gerard's testimony is not the behavior of Clorite's father during this incident but rather that of Clorite himself.   Yet he omits from his description of the incident  all reference to the facts pertaining to Clorite's own very significant and relevant involvement.

The two Case Incident Reports that Dreier has offered are Exhibit A to Clorite's Motions In Limine.  Each was prepared by and filed with the Madison Police Department in the ordinary course of business, one filed by Gerard himself and another by a fellow officer

on the scene. (See Gerard testimony annexed as Exhibit A hereto).  They are to the following effect:

1.  On August 27, 2008, the very week before Clorite and Dreier began as roommates at college, Gerard responded to a 911 call from Clorite's mother reporting "a suicidal male with a knife."  This turned out to be Clorite.

2.  When Gerard and other officers arrived at Clorite's home, his father warned Gerard not to speak with Clorite because "Ben would get angry and go after [Gerard]."  His mother warned that "if you go near him, he'll stab you with a knife."

3.  Shortly thereafter, Clorite "came to the railing at the top of the stairs and was obviously out of control yelling various profanities in an extremely agitated state."

4.  Clorite's father "could not control him" and had to "slap" him "in an attempt to stop his rant."

5.  Gerard observed "fresh damage" to the door to Clorite's room and elsewhere.

6.  Clorite's mother urged that Clorite needed "to go to the hospital," and the officers attempted to arrange that.

7.  When the officers approached Clorite in his bedroom, he continued "screaming profanities."  When the officers then had to restrain Clorite's father, who was wielding a baseball bat and attempting to prevent the officers from entering Clorite's bedroom, Clorite himself "lunged toward" Gerard and had to be "restrained" by another officer.

8. Clorite was then transported by ambulance to Yale New Haven Hospital.

Defense counsel objects to the police reports and Gerard's related testimony based on his "anticipating that plaintiff intends to present these matters to the jury to paint Ben as an excitable, possibly unstable individual, and a bad person," which he claims is inadmissible "character evidence" and "not probative to any inter-contact with plaintiff." In fact, however, this evidence is not offered to show that Defendant is a "bad person," but it is being offered to show his state of mind when he met Dreier as excitable, unstable, confrontational and, indeed, violent, which is highly probative of how Clorite interacted with Dreier from the very beginning of their relationship.

This incident occurred one week before the parties met and started rooming together. Both parties agree that from that very first day they did not get along, though each has a different explanation. Clorite stated to the Union College Administrative Panel (see Exhibit B hereto) that his problems with Dreier began the day they met, on September 6, 2008. He maintains that from the very beginning Dreier was uncooperative and unreasonable. Id. Dreier maintains that from Day 1 Clorite showed himself to be a violent, apparently troubled, out-of-control individual with whom it was impossible to get along. Dreier maintains that Clorite's intentional infliction of emotional distress began right at the outset of the term, that from the beginning Clorite constantly screamed profanities at him and threatened him with physical confrontations. Clorite denies this.

This very much puts in issue the state of mind that Clorite brought with him to college when he encountered Dreier. The police reports evidence that. By reason of the

very close proximity in time between that incident and the beginning of what Dreier claims was a campaign of abuse, intimidation and harassment, the evidence of that incident goes to state of mind, not character, and is offered for that purpose. Certainly, if Clorite is prepared to stipulate that he came to school with a violent state of mind, that he came to school with anger and inclination to screaming profanities and had a very hard time controlling himself, then this evidence might not be necessary.  But absent that, Dreier is entitled to introduce evidence of the state of mind he encountered in Clorite when they met and when Clorite embarked on his campaign of harassment and abuse.

Furthermore, even if Dreier offers this evidence for the additional purpose of actually evidencing Clorite's character and not just his state of mind, it should be admissible, because Clorite himself has made his character an issue.  He has asked witnesses to expressly vouch for his "character" (see Exhibit C) and to contrast it in particular to Dreier's character. (See Exhibit D).  He has designated this testimony in the JPTO.  Once a party makes character an issue, evidence of his character that might otherwise be barred by FRE 404(b) is admissible. E.g., United States v. Akpan, 407 F.3d 360, 373 (5th Cir. 2005).

Finally, this evidence is also admissible with respect to punitive damages.  In the event Clorite is found liable on Dreier's claims for assault and battery or on his claim for intentional infliction of emotional distress, this evidence shows very plainly a pattern of physically threatening, out-of-control, profanity laced behavior on Clorite's part, which a jury may find should be curtailed in the future by imposing punitive damages.  Clorite

points to authority (Hynes v. Coughlin, 79 F.3d 285 (  )), which stands for the proposition

that a plaintiff cannot use evidence of prior acts to show that the defendant committed a

similar act at issue in the present litigation, but this evidence is not offered for that

purpose.  It is not offered to show that Clorite is liable for his conduct asserted here by

reason of prior similar conduct but rather to show, if he is found liable here, that he is

inclined to repeat this sort of conduct.  It is well settled that one of the principal purposes

of punitive damages is to discourage defendants from repeating the conduct for which they

are held liable and that evidence of such prior conduct may be introduced to demonstrate

the need for such deterrence. E.g., Morris v. Eversley, 2004 U.S. Dist. LEXIS 6840 (SDNY

April 20, 2004).  Any concern that the jury will consider this evidence for a broader

improper purpose can be obviated with a an appropriate limiting instruction.

In the end Clorite rests much of his motion to preclude this evidence on argument

that it is impeachable.  He contends that "there are sharp differences in various versions of

events that evening" and that "Gerard's truthfulness" is "ripe for dispute."  He points to

purportedly inconsistent accounts by other officers or by Gerard himself.   Dreier is

confident that a jury will find Gerard's testimony to be entirely consistent and compelling,

but the possibility that this evidence can be attacked by other evidence has nothing to do

with its relevance.

Likewise, Clorite urges exclusion on the basis of prejudice, as if that were grounds

for exclusion.  Of course, this evidence is prejudicial to Clorite.  It shows his violent and out-

of-control state of mind in the relevant time frame of his interacting with Dreier; it

contradicts testimony from other witnesses as to his purportedly good character; it shows a pattern of confrontational and threatening behavior for consideration of punitive damages. The issue, though, is not whether the evidence is prejudicial but whether it is unduly prejudicial relative to its probative value, and Clorite has done nothing to demonstrate that.

For the foregoing reasons, this evidence is clearly relevant and admissible.

III. Clorite's Consumption of Alcohol

Clorite asks that Dreier be precluded from questioning him and his other roommates about their consumption of alcohol. He contends that Dreier will do so "for no other reason than to paint [Clorite] and his roommates as bad people who were found to violate a rule governing student activity, even though these incidents have nothing whatsoever to do with this case." He points to his denial in deposition that he had consumed alcohol on January 27, 2009, the day that he engaged Dreier in the physical altercation that is the subject of Dreier's claims for assault and battery and the day that he posted the statement on the internet that is the subject of Dreier's claim for libel.

Of course, Clorite's denial in that regard should not preclude evidence of his alcohol consumption calling that denial into question, but the larger point is that this case is much broader than the events of January 27. Indisputably, Clorite and his other roommates did consume alcohol in their room while rooming with Dreier, in violation of school policy. Dreier maintains that their drinking was frequent and is very relevant to (i) Dreier's claim

8

of intentional infliction of emotional distress and (ii) Dreier's defense to Clorite's

counterclaims that Clorite withdrew from Union College as a direct result of harm to his

reputation from Dreier's defamatory statements.


<u>A . The Alcohol Consumption by Clorite and His Other Roommates Is Highly
Relevant to Dreier's Claim of Intentional Infliction of Emotional Distress</u>

    In claiming intentional infliction of emotional distress, Dreier asserts that Clorite

created an enormously hostile and threatening environment for Dreier in their room and

on campus during the course of the six months that they roomed together.  He contends

that this was fueled by Clorite's drinking.  As part of his claim Dreier further asserts that

Clorite incited his other roommates to participate in Clorite's abuse and harassment of

Dreier.  He contends that this was fueled by Clorite's drinking with them.  Clorite has

acknowledged that while rooming with Dreier he was disciplined by the school

administration on at least two occasions for violating rules against the consumption of

alcohol in the dorm room and that on at least one of these occasions one of his other

roommates was drinking with him.  (See Exhibit E hereto).  Each of his other two

roommates has acknowledged in their depositions that they too were disciplined for

drinking while rooming with Dreier; one of them was disciplined repeatedly.  (See Exhibit F

hereto).  It is undisputed that Dreier was never disciplined for drinking.


    Dreier is entitled to show the role that alcohol played in Clorite's own abusive

behavior and in his ability to incite others to join in the abuse.  He is entitled to show that

drinking alcohol in the suite became a shared experience among Clorite and his two other roommates which excluded Dreier and inevitably victimized Dreier. He is entitled to show that drinking not only contributed to the abuse but has compromised the ability of Clorite and his other roommates to now recall the abuse. One of the roommates who was repeatedly disciplined for drinking acknowledges that he joined in Clorite's abuse of Dreier by throwing a newsaper at him which struck Dreier. (See Exhibit G). The newspaper carried an article about the arrest of Dreier's father. Clorite, of course, can challenge at trial that alcohol played a part in his abuse of Dreier, but that hardly means that Dreier must concede the point, as Clorite now urges.

One of the three Madison Police Reports which Clorite asks the Court to exclude bears on this point in particular. This Report is Exhibit B to Clorite's motion papers (which, again, was prepared by Lt. Gerard in the course of his duties and has been confirmed by him as accurate; see Exhibit A hereto at 25-28). Clorite urges its exclusion, because, according to him, it is only "a compilation of 'bad acts' by the Clorite family," but this Report is not being offered to demonstrate the bad acts of any other member of his family or any "bad acts" of Clorite himself -- other than the incidents of his unlawful alcohol consumption shown on the Report. It shows that Clorite himself, on July 24, 2007, was among "a large group of under age minors consuming alcoholic beverages." It shows further that on July 30, 2008, less than six weeks before he began rooming with Dreier, Clorite was again found among "a large group of under age minors consuming alcoholic beverages," and this time he was issued an infraction for violation of the law.

This history of illegal drinking on Clorite's part just before joining Dreier at Union, followed by his drinking thereafter, in violation of school policy, upon rooming with Dreier at Union, is highly relevant to Clorite's state of mind and lack of self-control in his interactions with Dreier which form the context of Dreier's claim for intentional infliction of emotional distress.

In fact, defense counsel himself made an issue of this consumption of alcohol, both by Clorite and his other roommates, by eliciting testimony from each of the roommates that there were freshman housing rules at Union to deter roommates from abusing each other and that they believed Dreier was responsible for the antagonism because he had violated the spirit, if not the letter, of the rules by failing to be cooperative. (See Exhibit H hereto). As one of these roommates acknowledged, however, it was actually the roommates who had violated the housing rules by consuming alcohol in the room, which was strictly prohibited. (See Exhibit I hereto).  Clorite has designated this testimony in the JPTO. Clorite cannot, on the one hand, defend himself against Dreier's claims of abuse by contending that the fault lies in Dreier's purported flouting of the housing rules by which they were to live together, and on the other hand insist that Dreier be precluded from showing that, indisputably, it was Clorite and his other roommates who were breaking the rules intended for the harmony and protection of roommates and thereby abusing Dreier.

### B.  Clorite's Consumption of Alcohol Is Highly Relevant to Dreier's Defenses to Clorite's Counterclaims that He Withdrew from Union as a Direct Result of Dreier's Defamatory Statements

Clorite's counterclaims for libel and slander are predicated on his contention that he was forced to withdraw from Union College at the end of his freshman year as a direct result of the harm to his reputation brought about by Dreier's defamatory statements. In particular, his single item of special damages necessary to sustain those counterclaims is a claim of "lost" tuition that he contends resulted from his inability to recoup his tuition for the school term in which he withdrew. Dreier maintains that Clorite's withdrawal and lost tuition did not result from any harm to Clorite's reputation but rather from several other factors, including most notably his poor academic performance and, in particular, other disciplinary incidents resulting from Clorite's consumption of alcohol in violation of school policy. If Dreier can show by this evidence that there is not the necessary causation between any special damages and the defamation, Clorite's claims must fail.

There is indeed ample evidence showing that Clorite's consumption of alcohol in violation of school policy was a major, if not predominant, factor in his withdrawal. Clorite has admitted that in addition to the 5 disciplinary points that were assigned to him by the Dean as a result of the Administrative Hearing relating to the parties' conduct charges against each other, he had 3 other disciplinary points resulting from violations of the school's policy against drinking. (See Exhibit E hereto). He further acknowledges that at the time of his withdrawal from Union there was pending another disciplinary action against him for violation of the school's policy against drinking. (See Exhibit E). A letter from the Dean (annexed hereto as Exhibit J) indicates that he was spared additional disciplinary points for that violation only because he was withdrawing and that his

withdrawal was at least partly arranged at that time so that he could avoid further discipline and apply for reenrollment without that sanction on his record.

Accordingly, the evidence of Clorite's consumption of alcohol and related disciplinary sanctions is of crucial relevance to the legal and factual viability of Clorite's defamation counterclaims, both as to liability and damages.

IV.  The Streeter Letter Is Not Admissible as a Hearsay Exception under FRE 807

Dreier has addressed the inadmissibility of the Streeter Letter in his own Motion in Limine #1, and the Court is respectfully referred thereto.  Dreier opposes admission of the Streeter Letter, on the grounds of hearsay, at least insofar as it is offered for the truth of (i) any statements attributed to Dreier therein (see pages 9-10 of the letter); (ii) any conduct attributed to Dreier therein based on statements provided by third parties (see page 9); (iii) any conclusions regarding Dreier therein based on statements attributed to him by third parties; (iv) any statements claimed to have been made by third parties to Dreier therein, based on information provided by third parties (see page 10); and (v) any statements or conduct attributed therein to Dreier's father based on statements provided by third parties.

Dreier further objects to the Streeter Letter on grounds of relevance, insofar as (i) it is offered to evidence anything regarding the property in the Hamptons belonging to Dreier's father (for the reasons set forth in Dreier's Motion in Limine #2), or (ii) it is offered for the truth of statements therein concerning the crimes of Dreier's father.

13

### A. The Streeter Letter Is Not Admissible as a Hearsay Exception under FRE 803(8)(C)

Rule 803(8)(C) of the Federal Rules of Evidence excepts from the hearsay rule in a civil action "public records and reports" setting forth "factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness."   The Streeter Letter does not meet any of the requirements for this exception.

### 1. The Streeter Letter is not a "public record or report" as contemplated by the Rule.

This is not a matter of semantics as to what constitutes a "report" or "public record. It is a piece of advocacy, an argument in an adversary proceeding, specifically the bail proceeding of Dreier's father.  It was generated solely for the purpose of litigating that proceeding.  The fact that it was submitted by the Government makes it no more of a public report than any other such submission in a contested litigation.

Clorite cites to a number of cases where public reports were admitted under this exception.  Not a single one of these cases involved anything even remotely resembling a letter written to the Court in an adversary proceeding.  The leading Supreme Court case on FRE 803(8)(C), <u>Beech Aircraft Corp. v. Rainey</u>, 488 US 153, 102 L Ed 2d 445, 109 S.Ct. 439 (1988), involved an investigative report regarding a Navy plane crash prepared in his investigatory capacity by the Judge Advocate General.  <u>Bradford Trust Company v. Merrill</u>

Lynch, 805 F.2d 49 (2d Cir. 1986), involved two FBI reports regarding the authenticity of a certain signature. Bridgeway Corp. v. Citibank, 201 F.3d 134 (2d Cir. 2000), involved U.S. State Department Country Reports regarding the judiciary of Liberia. SEC v. Pentagon Capital Management PLC, 722 F.Supp. 2d 440 (SDNY 2010), involved testimony by the Director of SEC Enforcement before the Senate Subcommittee on Financial Management regarding day trading data and the SEC agenda on that subject. In the Matter of Nautilus Motor Tanker Co., 85 F.3d 105 (3d Cir. 1996), involved a U.S.Coast Guard Report on the grounding of a ship. Distaff Inc. v. Springield Contracting Corp., 984 F.2d 108 (4th Cir. 1993), involved an investigative report by a Chief Fire Inspector into the cause of a fire. Gentile v. County of Suffolk, 129 F.R.D. 435 (EDNY 1990), involved a New York State Investigative Commission Report concerning the possible misconduct of public officers.

None of the cases cited by Clorite even mentions the possibility of a document like the Streeter Letter qualifying for the exception, and though various of the cases themselves cite to other cases where reports were admitted under the exception, none of those cases cited involved a document submitted in argument in a collateral adversary proceeding, much less an unsworn letter such as this. Nor has Dreier come across any such case in this or any other jurisdiction.

This is not a matter of semantics. Dreier recognizes that the Rule defines "public records and reports" to include "statements" or "data compilations" of "public offices or agencies in any form" which set forth "factual findings resulting from an investigation." However, there is no suggestion of any kind in any authority that the exception includes or

was intended to include a letter submitted by an AUSA in a criminal proceeding setting forth his argument and conclusions as to why bail should be denied, even where the letter includes various of the findings upon which the argument is based.

    2.  The Streeter Letter does not meet the criteria for "trustworthiness" required by the Rule

Defense counsel has made very clear in the course of this litigation that his purpose in offering this letter is not only to purportedly substantiate Clorite's statement that he heard Dreier engaging in illegal acts but also to suggest to the jury that Clorite's statement has the imprimatur of the United States Government and that Dreier's claim that Clorite's statement is false amounts to Dreier accusing the Government, and Mr. Streeter in particular, of "lying."  Indeed, at Dreier's deposition defense counsel repeatedly attempted to bait Dreier into calling AUSA Streeter a "liar" in questioning Dreier's refusal to embrace the Streeter Letter (see Exhibit K hereto), and throughout the litigation Clorite has equated Dreier's claim of libel with his doing so.

In fact, Dreier has never challenged the honesty of the AUSA in preparing or submitting his letter, and he does not do so now.   He does, however, vigorously challenge the reliability, or "trustworthiness," of the letter, as that term is used in the Rule, and he submits that the letter falls far short of what the Rule requires in that regard for the hearsay exception to apply.

16

Rule 803(8)(C) expressly excludes from the exception any document as to which the "sources of information or other circumstances" indicate its lack of "trustworthiness." As the Supreme Court has made clear, the requirement of "trustworthiness" goes to the earmarks of reliability of the hearsay statements in the document, not the honesty of its author. The Streeter Letter cannot possibly satisfy the criteria for "trustworthiness" under the Rule which have been adopted by the Supreme Court and applied in the federal judiciary.

Thus in Beach Aircraft, supra, 109 S.Ct.at 449, the Supreme Court held that even if the 803(8)(C) document is in the nature of a "public record or report" (which, as shown above, the Streeter Letter most definitely is not), the trial court must still make a determination as to whether the report as a whole (or the portions of it which are offered) is sufficiently trustworthy to be admitted and has "the obligation to exclude an entire report or portions thereof ... that [the trial court] determines to be untrustworthy." The Court embraced the nonexclusive list of four factors proposed by the Federal Rules of Evidence Advisory Committee for determining the trustworthiness of the document: "(1) the timeliness of the investigation; (2) the investigator's skill or experience; (3) whether a hearing was held; and (4) possible bias when reports are prepared with a view to possible litigation." Id.at n.11.

The Streeter Letter cannot possibly pass muster under these criteria (which are addressed hereinbelow in perhaps the order of the letter's most obvious inadequacies).

17

### (i) The Lack of Any Hearings

Indisputably, there were no hearings at all regarding the findings reflected in the Streeter Letter or any tentative findings or any "investigation" underlying the findings. There was no opportunity for public scrutiny, public input or public airing of any of the findings, as is often, if not typically, the case with the sort of public reports excepted under Rule 803(8)(C).

Nor was there any hearing as to the findings in this letter after its submission (even assuming such a hearing could suffice to lend trustworthiness to the letter). While there was argument before the Magistrate and thereafter before Judge Rakoff in the context of the bail proceeding, it is a matter of public record that there were no witnesses called, no proof offered or taken and no findings by the Court as to whether any of the statements in the letter or, more particularly, any of the statements attributed to Dreier in the letter, were correct. Indeed, Mr. Streeter's position in his letter based on those statements was ultimately rejected by the Court, inamuch as the bail package he opposed was approved, with Dreier as a co-signee. That hardly implies any judicial adoption of the statements in the letter to the effect that Dreier was unfit by reason of the statements attributed to him.

In considering the importance of a hearing underlying a proposed Rule 803(8)(C) document, the courts also look to the procedure of the hearing to determine whether procedural safeguards were in place to lend support to the trustworthiness of the investigation underlying the document. See, e.g., <u>Gentile v. County of Suffolk</u>, supra, 129 F.R.D. at 453-455. Here there was not only no hearing at all, there is no basis to conclude

that the investigation underlying this letter, even private as it was, included any of the sort of safeguards normally attendant to a disinterested proceeding aimed at the truth.  In this respect, the most glaring deficiency of all is the fact that neither Mr. Streeter nor anyone else from the US Attorney's Office or from the office of the Receiver working with the US Attorney's Office ever communicated with Dreier to assess the validity of the statements attributed to him by third parties. (See Exhibit L).   Dreier was never told about these statements attributed to him in the letter, was never asked to deny or confirm them,  and obviously never had the opportunity to confront the third parties who provided the information about their version of the events.

Dreier is certainly not suggesting that the US Attorney or the Receiver working with him was not free to conduct their investigations in the way they saw fit or that it was incumbent upon them to speak with Dreier for purposes of their investigation.  But for purposes of a private litigant now seeking to offer the Streeter Letter as an exception to hearsay under Rule 803(8)(C), the "procedure" was clearly inadequate for the document to now pass muster as admissible.

(ii) Possible Bias

As stated above, one significant factor weighing against admission of the document as an exception to hearsay is whether it was prepared with a possible view towards litigation and might thereby entail the sort of bias customarily associated with such documents.  See LeRoyv. Sabena Belgian World Airlines, 344 F.2d 266, 272 (2d Cir.), cert. denied, 382 U.S. 878, 86 S.Ct. 161, 15 L.Ed.2d 119 (1965). Here the document was not only

prepared in anticipation of litigation, it was prepared during and entirely for the purpose of litigation. AUSA Streeter sent this letter to Magistrate Judge Eaton, in the course of the bail proceeding of Dreier's father, in an effort, of course, to marshal whatever arguments he could make to persuade the Court to deny bail. Obviously, there was no element of neutrality attached to this document. The statements attributed to Dreier were a key part of the Government's effort to deny bail. It was part and parcel of zealous advocacy. As such, it clearly is not the type of document in any way contemplated by Rule 803(8)(C).

### (iii) The Skill and Experience of the Investigators

While there may be some presumption of skill and experience regarding investigators attached to the US Attorney's Office, the fact is that we know nothing about the identities or backgrounds of the particular investigators that were involved here. There is no indication that Mr. Streeter himself spoke to any of the third parties reporting information about Dreier or that he personally participated in the investigation. Indeed, the implication in the letter is very much to the contrary. It is apparent that he is stating what unidentified third parties told him about what other unidentified third parties told them about conversations they claim to have had with Dreier. This is the most rank form of hearsay -- compound hearsay -- which surely diminishes the confidence one should have in the "findings."

Furthermore, while we don't know the particular skill sets of these particular investigators, we do know, among other things, that (i) no one ever checked with Dreier himself about their information regarding what Dreier allegedly said; (ii) the source for

their information that Dreier had attempted to transfer ownership of the Hamptons properties was an electrician/caretaker for the properties who may well have been earnest but testified in deposition that the papers Dreier allegedly gave him to accomplish that transfer were unsigned and comprised of two short pages with no deed, that he did not actually know who owned the properties, and that he did not actually understand the legal significance of the papers but was told by his own lawyers that they were in fact of no legal effect; (iii) those two one-page documents which Mr. Streeter states in his letter were handed over to the Receiver by the caretaker and purportedly evidence the attempted transfer, indisputably involve only the ownership of two LLC's which, indisputably, as a matter of public record, were not the owners of the properties and had no assets, something the investigators could readily have learned from the public records; (iv) Mr. Streeter's source for the balance of information about what Dreier purportedly said set forth in his letter was the personal assistant to Dreier's father, who has acknowledged in deposition that she assisted Dreier's father in the crime for which he was arrested in Toronto and that she was cooperating with the US Attorney in reporting on Dreier's alleged statements at a time when she was concerned about her own exposure; and (v) the US Attorney not only attacked the suitability of Dreier as a co-signee in the bail proceeding but attacked as well the suitability of the other co-signee, Dreier's then 88 year-old grandmother, based on the Government's claim at that bail proceeding that she had improperly taken funds from Dreier's father to purchase her home, which information the Government later conceded was erroneous.

In setting forth the foregoing, Dreier does not take issue with the sincerity of the investigation underlying Mr. Streeter's Letter. But, at least insofar as Mr. Streeter's letter reflects findings relating to Dreier himself, Dreier submits that there is no basis to find that the investigation underlying the letter has the earmarks of "trustworthiness" for purposes of Rule 803(8)(C). This is especially so when one considers the "trustworthiness" of the "sources of information," as the Rule instructs. The ultimate sources of information here were not the investigators themselves but two individuals they relied upon, whose background and reliability are not addressed in Mr. Streeter's letter and, for the reasons set forth above, should certainly not be presumed.

### (iv) The Timeliness of the Investigation

Presumably, an investigation is typically deemed more trustworthy the closer in time it occurs relative to the events investigated, and certainly the investigation here was prompt and relatively contemporaneous with the events. Dreier submits, however, that in this case, the fact that so little time transpired between the events and the fact finding and then between the fact finding and Mr. Streeter's letter only undermines its reliability.

The investigation was performed and the letter was prepared under the exigencies of a scheduled bail proceeding. An investigation and "report" performed for the purpose of and under the pressure of a hearing deadline hardly connotes the sort of reliability and completeness that one can normally expect from the sort of public investigation (such as that into an airline crash or underlying an annual SEC report) that is reflected in the type of public reports that courts have found warrant a hearsay exception under FRE 803(8)(C).

For the foregoing reasons, there is simply no basis whatsoever to find that the Streeter Letter, which is undeniably hearsay, should be admitted as an exception under FRE 803(8)(C) for the purposes it is offered.

### B.   The Streeter Letter Does Not Qualify as a Hearsay Exception under FRE 807

Clorite argues alternatively that the Streeter Letter should be admitted under the residual exception to hearsay set forth in FRE 807.  This suggestion is entirely without merit.

As Clorite correctly observes, FRE 807 permits the admission of hearsay evidence that (a) has circumstantial guarantees of trustworthiness, (b) is offered as evidence of a material fact, (c) is the most probative evidence reasonably available, and (d) would be in the interests of justice to admit.  These criteria do not permit admission of this letter.

Clorite suggests that the contents of the letter should be deemed circumstantially trustworthy merely because it "was prepared and submitted in opposition to a criminal defendant's bail application."  However, as shown above, for a myriad of reasons that circumstance in fact lends no presumption of reliability and is actually a significant factor that the Supreme Court has said should weigh against its admission.  The document was prepared as a piece of advocacy, which necessarily raises issues as to bias.

Clorite attempts no argument that admission of this document would be in the best interests of justice, and surely that cannot be a factor here warranting a hearsay exception. There is no basis in this private civil proceeding to find that justice weighs in favor of depriving Dreier of the usual protection that litigants enjoy against hearsay.

Most of all, there is no basis to find that the letter is the most probative evidence reasonably available. The letter is offered to supposedly evidence that Dreier made certain statements to certain third parties who reported those statements to the US Attorney's Office or persons working with the Office.  There is no dispute that those persons who reported the statements were David Rosante (the former caretaker of the Hamptons properties) and Catherine Derby (the former personal assistant to Dreier's father).  Insofar as the letter purports to set forth what Dreier told Mr. Rosante and Ms. Derby, it is only derivative of what they told the US Attorney's Office (or investigators working with the Office) Dreier said.  The letter therefore can hardly be the most probative evidence available as to what they claim Dreier told them, because they themselves are not only available to testify, they have already done so in deposition.  They were asked about everything Dreier told them, and they answered.  They are also on Clorite's JPTO witness list as live trial witnesses.

In this circumstance, where the party offering Rule 807 hearsay evidence is able to obtain evidence of those purported facts through other sources -- especially more direct sources -- the law is clear that a hearsay exception will not be granted. E.g., <u>Ragin v.</u> <u>Newburgh Enlarged City School District</u>, 2011 U.S. Dist. LEXIS (SDNY June 3, 2011.  Indeed,

this should be an important factor in denying an exception under Rule 803 (8)(C) as well. It is further noteworthy that in the only case cited by Clorite for admission of the Streeter Letter under Rule 807, <u>Amcast Indust. Corp. v. Detrex Corp.</u>, 779 F.Supp. 1519 (N.D. Ind. 1991), admission of the document for the truth of its investigatory findings was actually denied; admission was limited merely to show that an investigation had occurred.

Rule 807 is intended to be reserved for "exceptional cases." Conoco, Inc. v. Dep't of Energy, 99 F.3d 387, 392 (Fed. Cir. 1997). This is not such a case.

## C. The Statements Attributed to Dreier in the Streeter Letter Are Not Admissions.

Remarkably, after arguing strenuously, albeit futilely, that the statements in the Streeter Letter should be admitted by way of an exception to hearsay, either under FRE 803(8)(C) or FRE 807, Clorite ultimately resorts to the entirely misguided argument that there is no hearsay issue at all, because, according to him, the statements attributed to Dreier in the letter are admissible party "admissions." Here Cloirte shows a complete misunderstanding of the whole concept of an admission and how it relates to hearsay.

Under FRE 801(d)(2)(A), an "admission by party-opponent," which is not hearsay, includes a "a party's own statement offered against the party." However, the statements attributed to Dreier in the Streeter Letter are not Dreier's statements. They are Mr. Streeter's statements about what third parties said Dreier had told them. Testimony by Mr. Streeter himself as to what Dreier told him (if that had occurred) or testimony by one of the third parties to whom Dreier allegedly made these statements as to what Dreier said to that

third party might be admissible as an admission.  But a statement by Mr. Streeter about what someone said Dreier said – especially an unsworn statement – is at least one step, if not more, removed from an admission as against Dreier.

### V.  Gerald Shargel

Clorite asks that the Court "caution" Dreier that Mr. Shargel cannot opine on matters of law.  Dreier is well aware of that and, as indicated in his initial Rule 26(a) disclosure, has no intention of offering Mr. Shargel as a witness for that purpose.

### VI.  Leavitt Email to Trish Williams

Clorite objects to this document on five grounds: (i) that it is "conclusory," (ii) that it is "highly prejudicial," (iii) that it is barred by FRE 404(b) as evidence of "character disposition," (iv) that it is prejudicial, and (v) that it is inaccurate.
None of this can be a basis to exclude the document.

The document, a letter from the Union College Dean to Clorite's psychotherapist in August 2009, states that the administration was concerned about Clorite's "willingness to accept our authority," that Clorite had "reacted angrily" during freshman year at the Director of Residential Life, that the administration was "concerned about [Clorite's] academic progress" in light of his performing "poorly academically" during freshman year, that "his withdrawal spring term circumvented an academic suspension."

These are all factual statements, both as to events that had occurred and what the school administration believed regarding Clorite. There is no basis to exclude them as "conclusory." The statements may indeed be "highly prejudicial" to Clorite, as they should be, but that is no basis for exclusion, particularly in light of their obvious relevance to the issues in this case regarding the reasons for Clorite's withdrawal from school in spring term of freshman year and his angry and aggressive behavior. The statements are not offered to show character disposition on Clorite's part but rather to show his actual behavior at Union in the context of Dreier's rooming with him. It further evidences Clorite's actual academic problems, as they related to his withdrawal, from the best source to speak to those problems, the dean himself. If it is inaccurate, Clorite of course will have the opportunity to contest it, but his challenging its accuracy is no basis for its exclusion.

Conclusion:

For all the foregoing reasons, it is respectfully submitted that Clorite's motions in limine should be denied in their entirety.

June 23, 2012                                      Respectfully submitted,

                                                   Spencer Dreier
                                                   Plaintiff Pro Se
                                                   425 East 58th Street
                                                   New York, NY 10022
                                                   (917) 841-9571

# EXHIBIT A

021811

11    and I will be asking questions today which I

12    believe are relevant to this case.

13              When I'm done Mr. Coleman will

14    ask you some questions of his own, the court

15    reporter will be transcribing everything that

16    is said, so we should all speak slowly enough

17    and clearly enough to allow her to do that.

18              If you could give your responses

19    orally rather than through gestures so she can

20    record your responses and hear your responses

21    that would be good, and just allow me to

22    finish my question before you answer them so

23    the reporter can accurately record both the

24    question and the answer.

25              Please let me know if you want a

                                              4

1                    ALLEN GERARD

2    question repeated and either I or the court

3    reporter will do so.

4              Please let me know if you don't

5    understand the question and I will try to

6    rephrase it.

7              And please let me know if you

8    want to take a break at any time at the

9    conclusion of the response to the pending

10    question.

11              Are you represented by counsel

12    today?

13        A    No.

14        Q    Are you appearing for this

15    deposition pursuant to a subpoena?

Page 3

021811
ALLEN GERARD

1
2 in enough trouble now and he wanted to move on
3 and speed things up.
4           MR. COLEMAN:  I object.  Again, I
5      object to the characterization and I
6      object to the relevancy.
7           We have a witness here, let's
8      move forward with this deposition.
9           What you and I say to each other
10      in an off-the-record conversation has
11      nothing to do with the progress of this
12      case.
13      Q      What kind of trouble did you
14 understand he was referring to?
15      A      I have no idea.
16      Q      Now, did there come a time in
17 2008 when you encountered Ben Clorite during
18 the performance of your police duties?
19      A      Yes.
20           MR. DREIER:  Let me ask the
21      reporter to mark as Gerard 1, a six-page
22      document entitled Case Report, dated
23      September 5, 2008.
24           (Whereupon, Gerard 1, Case
25      Report, September 2008, was marked by
                                          8
1                 ALLEN GERARD
2      the reporter for identification.)
3      Q      Mr. Gerard, do you have that in
4 front of you?
5      A      Yes, I do.
6      Q      Have you seen this document
                    Page 6

021811

 7    before?
 8         A     Yes.
 9         Q     Did you prepare this document?
10         A     Yes, I did.
11         Q     Did you prepare this document in
12    the normal course of performing your duties as
13    a police officer?
14         A     Yes.
15         Q     Is that your signature in the
16    lower left-hand corner of each page?
17         A     Yes.
18         Q     What was the purpose of preparing
19    this document?
20         A     To document an arrest and
21    interaction with the Clorite family from
22    Madison.
23         Q     At the bottom center of the
24    document there is a box with the words
25    "supervisor signature", do you see that?

                                          9
 1                 ALLEN GERARD
 2         A     Yes, I do.
 3         Q     Is that someone's signature
 4    there?
 5         A     Yes, that is Lieutenant Michael
 6    O'Conner's signature.
 7         Q     What was the purpose of obtaining
 8    his signature?
 9         A     Notarizes the report under oath.
10         Q     Is that custom and practice in
11    the Madison Police Department for case

021811

12    incident reports?

13        A       Yes.

14        Q       Was your signature to this

15    document notarized?

16        A       Yes.

17        Q       And where does that appear?

18        A       On the right-hand bottom corner

19    of the report.

20        Q       Is that custom and practice of

21    the Madison Police Department for case

22    incident reports?

23        A       It is customary for case incident

24    reports, if it is a serious case or involves

25    an arrest, minor cases sometimes don't have

                                        10

1                    ALLEN GERARD

2    it.

3        Q       In the ordinary course what is

4    done in the case incident report after they

5    are prepared?

6        A       The case incident report is filed

7    with the Records Division and then given out

8    to where it needs to go, whether court or

9    wherever it needs to go.

10        Q       To the best of your knowledge was

11    that done with this report?

12        A       Yes, it was.

13        Q       To the best of your knowledge was

14    this document maintained in the files of

15    Madison Police Department in accordance with

16    the standard practice?

17        A       Yes, it was.

                        Page 8

021811

18          Q       What was the date of the incident
19      reported here?
20          A       8/27/08.
21          Q       Where did the incident take
22      place?
23          A       Number 37 Weedon Lane, Madison,
24      Connecticut.
25          Q       Did you personally encounter Ben

                                                    11
1                       ALLEN GERARD
2       Clorite during the course of the incident
3       reported here?
4           A       Yes.
5           Q       Please describe Ben Clorite's
6       behavior during the course of the incident?
7                   MR. COLEMAN:  Objection to the
8               form of the question.
9                   MR. DREIER:  What is your issue
10              with it, Mr. Coleman?
11                  MR. COLEMAN:  Describe his
12              behavior?  What is that supposed to
13              mean?  Why don't you ask a specific
14              question.
15          Q       Can you please describe Ben
16      Clorite's actions during the course of this
17      incident?
18          A       Over the course of it he appeared
19      very upset and excited and confrontational
20      towards, I guess, law enforcement in general.
21          Q       Anything else?
22          A       He was swearing some profanities

                         Page 9

021811

23   and alluding to the fact that he didn't want

24   to deal with us in his house because the

25   Madison Police ruin kids' lives in Madison.

12

1                    ALLEN GERARD

2        Q      Anything else?

3        A      I'm just doing this from memory.

4   I would have to look at the report.

5        Q      Now, please take a few moments to

6   read over your report.

7        A      Sure.

8        Q      Let me know when you are done.

9        A      I scanned through it pretty

10   quick.  Ben Clorite in his bedroom -- there

11   was two parts of it.

12              One, he was at the top of the

13   stairs yelling down and ended where he was in

14   his bedroom and he was -- ended up standing on

15   the bed resisting our efforts to have him

16   removed from the house.

17       Q      Were you able to eventually

18   remove him from the house?

19       A      I didn't.  Officer Baxter was

20   able to do that.

21       Q      So you now read over this report?

22       A      Yes.

23       Q      Do you believe it is an accurate

24   account of the incident at the Clorite home on

25   August 27, 2008?

13

1                    ALLEN GERARD

2        A      Yes, I do.

Page 10

021811

```
 3      Q      Is there anything -- strike that.
 4             Is there anything in the report
 5   which you believe now is inaccurate?
 6      A      No, I do not.
 7      Q      Was there a 911 call related to
 8   this incident?
 9      A      Yes, there was.
10      Q      Who made the call?
11      A      It would be Ben's mother
12   Christine Clorite.
13      Q      On page one of the report you
14   wrote that it was a 911 -- strike that.
15             On page one of the report you
16   wrote that it was a "911 call involving a
17   suicidal male with a knife", do you see that?
18      A      I'm looking now.  Yes, I do see
19   that.
20      Q      Who is the male referred to in --
21      A      That would be Ben Clorite.
22      Q      On page two of the report, in the
23   first full paragraph, you state that Ben
24   Clorite's mother was screaming that she wanted
25   you to leave because "she didn't want this in
```

                                              14

```
 1                  ALLEN GERARD
 2   the newspaper", do you see that?
 3      A      Yes, I do.
 4      Q      Did she say why she didn't want
 5   it in the newspaper?
 6      A      No, actually she didn't.  I
 7   actually recall her saying that now, but she
```

                            Page 11

021811

21          Q       Who were these charges brought
22     against?
23          A       Ben's father, William Clorite.
24          Q       What were these charges?
25          A       Interfering with an officer,

                                              23

1                    ALLEN GERARD
2      which is Connecticut General Statute 53A 167A,
3      and that was the only charge.
4           Q       What is the status of those
5      charges?
6           A       The father received two year's
7      probation under the Connecticut accelerated
8      rehabilitation program, which two years is the
9      maximum you can receive, which I believe
10     expires August of this year.
11                  MR. DREIER:  Let me ask the
12             reporter to mark as Gerard Exhibit 2, a
13             three-page document, entitled Case
14             Incident Report, dated August 28, 2008.
15                  (Whereupon, Gerard 2, Case
16             Incident Report, August 2008, was marked
17             by the reporter for identification.)
18          Q       Have you ever seen Exhibit 2
19     before?
20          A       Yes.
21          Q       What is Exhibit 2?
22          A       It is a Case Incident Report from
23     the same incident written by another officer
24     on scene which is Robert Mulhern.
25          Q       Robert Mulhern, did he prepare
                              Page 19

021811
24

1              ALLEN GERARD

2       this report?

3              A       Yes, he did.

4              Q       Is that his signature at the

5       lower left-hand corner?

6              A       Yes, it is.

7              Q       At the time of the report what

8       was Officer Mulhern's position in relation to

9       yours?

10             A       He was a patrol officer at the

11      time.

12             Q       Is that your signature in the box

13      marked "Supervisor signature"?

14             A       Yes.

15             Q       Did you read this report before

16      you signed it as Supervisor?

17             A       Yes, I did.

18             Q       What is signified by your

19      signature as Supervisor?

20             A       The content of the report and

21      swearing him to it that it is the truth to the

22      best of his knowledge.

23             Q       Who notarized Mr. Mulhern's

24      signature?

25             A       I did.

25

1              ALLEN GERARD

2              Q       Is it your understanding that

3       Officer Mulhern prepared this report in the

4       normal course of performing the duties?

5              A       Yes.

Page 20

021811

6      Q      What is your understanding of
7  what was done with this report after it was
8  prepared?
9      A      Once it is signed off it is
10  submitted to the Records Division, and
11  originals are filed there and the copies go to
12  where they need to go.
13            In this case they go to GA23E
14  Superior Court in New Haven, Connecticut, our
15  criminal court.
16      Q      Is it your understanding that
17  Exhibit 2 was maintained in the files of the
18  Madison Police Department in accordance with
19  police standards?
20      A      Yes.
21      Q      And standard practice?
22      A      Yes.
23      Q      In the upper right-hand corner of
24  the report it's marked supplementary, do you
25  see that?

                                      26

1                ALLEN GERARD
2      A      Yes.
3      Q      What does that signify?
4      A      It means there is more than one
5  report for the same incident.
6      Q      Did you ever see Exhibit 2
7  before?
8      A      Yes.
9      Q      Have you read Exhibit 2 before?
10      A      Yes.

021811

11      Q      Do you have any reason to believe

12   that there is anything in this report which is

13   not accurate?

14      A      No.

15      Q      Look at the last sentence of the

16   first paragraph of this report, it states that

17   "Mr. Clorite stated that her son was talking

18   to his girlfriend", do you see that?

19      A      Yes, I do.

20      Q      Was it your understanding that

21   Ben Clorite had been speaking to his

22   girlfriend during this incident or shortly

23   before?

24      A      Yes.

25      Q      Was it your understanding that

                                        27

1              ALLEN GERARD

2   Ben's emotional state during this incident had

3   anything to do with a conversation he was

4   having or -- withdraw that question.

5              Was it your understanding that

6   Ben's emotional state during this incident had

7   anything to do with the conversations he had

8   or was having with his girlfriend?

9              MR. COLEMAN:  Objection.

10             MR. DREIER:  What is your

11         objection?

12             MR. COLEMAN:  No basis or any

13         foundation of fact has been laid here

14         for the witness to properly answer that

15         question.

16             MR. DREIER:  He just testified he

                      Page 22

# EXHIBIT B

-The three of us (myself, chris, owen) all knew it would not be a good situation living with Spencer when on the first day he told us that he was only at union because his dad wanted him to go and that he knew that because of his wealth he was set for life

-from day 1 Spencer never cleaned up after himself and left dirty bowls and dishes all over the floor

-Spencer felt as if the common room was his room to do work in even if there were already people in the room watching tv or just hanging out, he would tell people to be quiet or turn the tv off even though the dorm is a place to live and not to do work as Joe stated in our meeting with him.

-Spencer was difficult to deal with and argumentative since the first day when he has a pile of 6 empty boxes which he used to pack his things in and felt he could just leave in the common room. We asked him many times to either move the boxes into his room where they were not in the way or throw them out. Weeks went by without the boxes being moved. The boxes led to our first meeting with Klenton, our RA, in which we discussed Spencer's total lack of respect for the common area and his inability to communicate. This meeting went no where as Spencer completely pushed aside our thoughts and ideas and told us we were wrong while simply brushing aside our ideas. This is when the thought that if Spencer remained in the room there would be continuous problems throughout the year became apparent to us.

-Another argument and meeting occurred when Spencer used my pasta cooker and left it full of red sauce on top of the food drawers for about a week while we continually asked him to clean it but he would tell us not to worry about it because he would clean it when he used it again. This brought up again the fact that Spencer had no respect for our thoughts wishes. This meeting with Klenton went in the exact same fashion as Spencer dismissed our ideas completely and told us what we were doing wrong.

-There were many nights where Spencer would be doing homework in his room and I would go to bed and he would ask for 10-30 more minutes and I would always give him time

-one night Spencer had gotten into an argument with one of the suitemates about the TV and I had voiced my opinion when asked and my response did not go in the direction he would have liked so when I went to bed he left the lights on played music just to spite me and make me upset.

-the culmination of all these arguments and meetings with Klenton led to a meeting with Joe, the RD of the building. This meeting began with Joe meeting with Owen, Chris, and I and we all expressed our willingness to attempt to make the situation work and keep Spencer in the room. When it came time for the meeting with all four of us Spencer once again rejected out thoughts and ideas completely and continually interrupted and put down our ideas. He was not willing to budge or compromise in the way he conducted himself in the room so when it came time to write up a contract he would not allow anything to be written on the contract unless it was exactly what he wanted. Once we realized that the contract would not be a solution we told Joe that a contract would not solve anything and the problem would continue and it would only be a matter of time before another incident occurred and we were right back in his office. We left the meeting at a total loss with Spencer getting exactly what he wanted. Joe lack of action

-over break when we had all learned of Spencer's situation with his father, Owen, Chris, and I all decided it would be the right thing to do to write an email to the school to let them know what was happening and to insure that Spencer was safe and in the right state of mind. Chris wrote up an email and we all read it and agreed it was a good idea to send it to the school. In addition to this all three of us reached out to Spencer just to make sure he was doing alright and to let him know that we were behind and him and that he should keep his head up.

-In addition to the email and the several attempts we all made individually to contact Spencer, I invited him to visit me over break when Owen and Chris were to visit. While at school we were all extremely friendly and

understanding. The three of us went out of our way to include him in all our plans. I was especially flexible and understanding when he would need to speak to his father or speaking to someone concerning his fathers situation, he would ask me to get out of the room and even if he had just walked in and I had been in there for a while I would gladly leave. He would ask me to leave for thirty minutes to an hour about 5 times a week. One day he even called me from class and asked me to go onto his computer and send a paper to his professor so he would not be penalized for being late and I did so gladly.

BC0002

# EXHIBIT C

**66**

```
1              O. Miller
2    question.
3    A   From my experience with Spencer Dreier
4    he's not a truthful person and I would
5    not expect him to be forthright with the
6    truth and the whole truth unless it
7    specifically – unless he uses just
8    parts of it to specifically help
9    himself.
10   Q   Do you believe your fellow classmates at
11   Union share your opinion in this regard?
12           MR. DREIER: Objection.
13       Hearsay.
14           MR. COLEMAN: Your objection
15       is noted.
16   A   I do believe so.
17   Q   Do you have an opinion regarding his
18   general character and reputation?
19   A   Um –
20   Q   And what is that?
21   A   Very negative. I believe.
22           MR. DREIER: Same objection,
23       same objection.
24   BY MR. COLEMAN:
25   Q   You can answer.
```

**67**

```
1              O. Miller
2    A   I believe he does not act in an upright
3    way befitting of a man of high
4    character. I feel as though he believes
5    that rules don't apply to him; that if
6    he doesn't get his way, he'll fight it
7    until he does get his way, and he --
8    okay.
9    Q   Given your knowledge of Chris Rushe, do
10   you have an opinion as to his reputation
11   of truthfulness and honesty?
12   A   Yes. I believe he's a truthful person.
13   Q   Do you believe your fellow classmates at
14   Union share this opinion?
15           MR. DREIER: Objection.
16       Hearsay.
17   A   Yes.
18   Q   Do you have an opinion regarding his
19   general character and reputation?
20   A   Chris Rushe's?
21   Q   Yes.
22   A   Yes. I believe he's -- he's a good
23   person, hardworking, very honest and
24   forthright with facts. Yeah.
25   Q   Given your knowledge of Ben Clorite, do
```

**68**

```
1              O. Miller
2    you have an opinion as to his reputation
3    for truth and honesty?
4    A   Yes. I believe he's very truthful.
5    Q   Do you believe your fellow classmates at
6    Union share this opinion?
7    A   Yes.
8           MR. DREIER: Objection. It's
9       hearsay.
10   BY MR. COLEMAN:
11   Q   Do you have an opinion regarding his
12   general character and reputation?
13   A   Yes. Again, he's a hard worker, good
14   person, very friendly on the whole, and,
15   yeah.
16   Q   All right. Do you believe your fellow
17   students at Union share this opinion?
18   A   Yes.
19           MR. DREIER: Objection.
20       That's hearsay.
21           MR. COLEMAN: Thank you Owen.
22       At the present time, this
23   concludes my questions for Owen
24   Miller subject to
25   cross-examination by Spencer
```

**69**

```
1              O. Miller
2    Dreier.
3       Spencer, your witness.
4       Thank you very much, Owen.
5    THE WITNESS: My pleasure.
6    MR. DREIER: Give me one
7    moment, please.
8    MR. COLEMAN: We're going to
9    take a break. It's now 1:08.
10   We've all been at this for over
11   an hour. Is five minutes good
12   for you, Spencer?
13   MR. DREIER: Sure. I can stay
14   on the line.
15   MR. COLEMAN: We weren't going
16   to cut you off.
17   We'll be back in five
18   minutes or less.
19   Do you wish to take a break,
20   Roberta?
21   REPORTER: Yes.
22   MR. COLEMAN: The court
23   reporter is also going to take a
24   short break.
25   (At which time, a brief
```

18 (Pages 66 to 69)

# EXHIBIT D



**62**

O. Miller

1
2  BY MR. COLEMAN:
3  Q  I want to focus your attention on Page 2
4     of this document.
5  A  (Witness reviewing document.)
6  Q  Which I represent to you is a statement
7     of Klenton Timori written to Joe
8     Melendez on Friday, October 24th, as
9     it states in the third and fourth line
10    of the second page of the document.
11    (Reading from Document)
12    In there it states: It seems like Chris
13    Owen and Ben wanted to work this out
14    more than Spencer did.  They were
15    willing to come and meet with you.  When
16    I talked to Spencer last night, he said
17    he didn't have time to meet because this
18    has wasted his time.  However, I saw him
19    playing video games after.
20    The facts related here, are these true
21    and accurate facts of your own personal
22    knowledge?
23 A  Yes.
24 Q  (Reading from Document)
25    He continues: However, not the guys

**63**

O. Miller

1     want him out of the room.
2     That's what it states.  It's
3     grammatically incorrect.
4        MR. DREIER:  Okay.  I'm
5     objecting to that last question.
6        MR. COLEMAN:  What question?
7        MR. DREIER:  No, the one you
8     just asked.  The one he obviously
9     just finished answering.
10       MR. COLEMAN:  Well, I don't
11    know what you're objecting to.
12       MR. DREIER:  Your question
13    asked him to draw a conclusion.
14       MR. COLEMAN:  Okay.  Your
15    objection is noted.
16    It says however, "Not the
17    guys want him out of the room."
18 BY MR. COLEMAN:
19 Q  Is that an accurate and truthful
20    statement, according to your own
21    personal knowledge?
22 A  Um, yes.
23 Q  (Reading from Document)
24    It continues:  The guys were upset

**64**

O. Miller

1
2  Spencer brought a girl he has known
3  since eighth grade to talk to you and
4  meet behind their back when they didn't
5  have a chance to defend themselves.
6  The facts related in there, are these
7  accurate and true, according to your own
8  personal knowledge?
9  A  Yes.
10 Q  (Reading from Document)
11    It further states:  Spencer is not
12    willing to give.
13    Of your own personal knowledge, is that
14    an accurate and truthful statement?
15 A  Yes.
16 Q  (Reading from Document)
17    It continues:  He doesn't reciprocate.
18    They say that Spencer does not respect
19    them for them to respect him.
20    Last night at the meeting they asked
21    Spencer two or three times, What can we
22    do to accommodate you better?  What can
23    we change?  Spencer seems to give vague
24    answers.
25    They said they have been patient with

**65**

O. Miller

1
2  Spencer for the past seven weeks but
3  it's not paying off.
4  Are these statements made herein
5  accurate and truthful of your own
6  personal knowledge?
7  A  Yes.
8  Q  (Reading from Document)
9     It continues:  At yesterday's meeting
10    Spencer did question Chris's
11    intelligence, which explain why Chris
12    got upset.
13    Do you recollect, of your own personal
14    knowledge, as to whether this is an
15    accurate and truthful statement?
16 A  I don't remember specifically.
17 Q  Okay.  Now Owen, given your testimony
18    today, do you have an opinion as to
19    Spencer Dreier's reputation for telling
20    the truth?
21       MR. DREIER:  Objection.
22    You're asking him to draw a
23    conclusion.
24 BY MR. COLEMAN:
25 Q  You can go ahead and answer that

17  (Pages 62 to 65)

66

O. Miller

1
2    question.
3    A    From my experience with Spencer Dreier
4    he's not a truthful person and I would
5    not expect him to be forthright with the
6    truth and the whole truth unless it
7    specifically – unless he uses just
8    parts of it to specifically help
9    himself.
10   Q    Do you believe your fellow classmates at
11   Union share your opinion in this regard?
12        MR. DREIER:  Objection.
13        Hearsay.
14        MR. COLEMAN:  Your objection
15        is noted.
16   A    I do believe so.
17   Q    Do you have an opinion regarding his
18   general character and reputation?
19   A    Um --
20   Q    And what is that?
21   A    Very negative, I believe.
22        MR. DREIER:  Same objection,
23        same objection.
24   BY MR. COLEMAN:
25   Q    You can answer.

67

O. Miller

1
2    A    I believe he does not act in an upright
3    way befitting of a man of high
4    character. I feel as though he believes
5    that rules don't apply to him; that if
6    he doesn't get his way, he'll fight it
7    until he does get his way, and he --
8    okay.
9    Q    Given your knowledge of Chris Rushe, do
10   you have an opinion as to his reputation
11   of truthfulness and honesty?
12   A    Yes. I believe he's a truthful person.
13   Q    Do you believe your fellow classmates at
14   Union share this opinion?
15        MR. DREIER:  Objection.
16        Hearsay.
17   A    Yes.
18   Q    Do you have an opinion regarding his
19   general character and reputation?
20   A    Chris Rushe's?
21   Q    Yes.
22   A    Yes. I believe he's -- he's a good
23   person, hardworking, very honest and
24   forthright with facts. Yeah.
25   Q    Given your knowledge of Ben Clorite, do

68

O. Miller

1
2    you have an opinion as to his reputation
3    for truth and honesty?
4    A    Yes. I believe he's very truthful.
5    Q    Do you believe your fellow classmates at
6    Union share this opinion?
7    A    Yes.
8        MR. DREIER:  Objection.  It's
9        hearsay.
10   BY MR. COLEMAN:
11   Q    Do you have an opinion regarding his
12   general character and reputation?
13   A    Yes. Again, he's a hard worker, good
14   person, very friendly on the whole, and,
15   yeah.
16   Q    All right. Do you believe your fellow
17   students at Union share this opinion?
18   A    Yes.
19        MR. DREIER:  Objection.
20        That's hearsay.
21        MR. COLEMAN:  Thank you Owen.
22        At the present time, this
23        concludes my questions for Owen
24        Miller subject to
25        cross-examination by Spencer

69

O. Miller

1
2    Dreier.
3        Spencer, your witness.
4        Thank you very much, Owen.
5        THE WITNESS:  My pleasure.
6        MR. DREIER:  Give me one
7    moment, please.
8        MR. COLEMAN:  We're going to
9    take a break. It's now 1:08.
10   We've all been at this for over
11   an hour. Is five minutes good
12   for you, Spencer?
13        MR. DREIER:  Sure. I can stay
14   on the line.
15        MR. COLEMAN:  We weren't going
16   to send you off.
17        We'll be back in five
18   minutes or less.
19        Do you wish to take a break,
20   Roberta?
21        REPORTER:  Yes.
22        MR. COLEMAN:  The court
23   reporter is also going to take a
24   short break.
25        (At which time, a brief

18  (Pages 66 to 69)

Christopher Rush

48

1       A.   Yes.

2       Q.   Do you have an opinion regarding his general

3   character and reputation?

4       A.   Yes.

5       Q.   And what is that?

6       A.   Stuck up, pretentious, dishonest, conceited,

7   self-absorbed.

8       Q.   Do you believe your fellow classmates at

9   Union share this opinion?

10      A.   Yes.

11           MR. COLEMAN:   Thank you very much,

12  Chris.  I appreciate your time and your attendance.  We

13  will take a break now as previously indicated.  It's

14  3:10.  Let's make an effort to come back at 3:20.  Is

15  that okay with you, Spencer?

16           MR. DREIER:   That sounds fine.  I'll

17  give you a call back at this number.  Okay?

18       (Recess taken.)

19           CROSS-EXAMINATION

20  BY MR. DREIER:

21      Q.   Chris, while we were roommates, did you have

22  an opportunity to see Ben and I interact?

23      A.   Yes.

24      Q.   How would you characterize how Ben and I got

# EXHIBIT E

Page 124

n, Mr. Coleman,

op  ocedure,

n, everything he's
copy, exactly
e we have done
other
kay, you'll get
ency now.
'll get copies
ve my word.
lled my
s that I've

en't fulfilled
t you do, so --
n, we could do
ime, okay.
t want to speak to

ot want to speak

Page 125

so pu. that on
ne --
time.
-- Mr. Coleman,

on the record the
me again
n?
, you say
u're taking up

forward.
e --
e so
through this

m Dean

aloud.
ollow-up
t you would
withdrawal from

---

Page 126

Clorite

1
2  Union College."
3      Q.   Did you ever discuss with Dean Leavitt on
4  or about May 21, 2009 about a voluntary withdrawal
5  from Union?
6          MR. COLEMAN:  The day is May 22nd, by the
7  way.
8      Q.   Ben?
9      A.   No.
10     Q.   On May 22nd did you have a discussion
11  with him?
12     A.   I never spoke to him in person.
13     Q.   Please read aloud the second sentence of
14  Exhibit 6?
15     A.   "As a condition of this withdrawal we
16  agreed that we would process no additional
17  disciplinary action at this time."
18     Q.   Did you have a discussion with Dean
19  Leavitt about the possibility of additional
20  disciplinary action against you?
21         MR. COLEMAN:  Objection.  He's already
22  answered that question.
23     Q.   Whether in person or not did you ever
24  have a discussion with Dean Leavitt about the
25  possibility of additional disciplinary action

---

Page 127

Clorite

1
2  against you?
3      A.   Not during the spring term.
4      Q.   Have you ever had a discussion of this
5  nature with Dean Leavitt?
6      A.   No.
7      Q.   Never?
8      A.   I answered the question.
9      Q.   Please look at the second paragraph of
10  the letter from Dean Leavitt, read aloud the second
11  -- sorry, read aloud the last two sentences of that
12  paragraph.
13     A.   "Will also be on probation, given your
14  eight disciplinary points, so any further violation
15  will risk suspension.  These terms are important as
16  a safeguard to the community."
17     Q.   Were you put on probation?
18     A.   Yes, I was on probation.
19     Q.   In Exhibit 6 dated May 22, 2009 Dean
20  Leavitt states that you have eight disciplinary
21  point, he states five points as a result of the
22  April 3rd administrative hearing.
23         What were the three points for that were
24  not the result of the April 3rd hearing?
25     A.   We had got written up.

---

Page 128

Clorite

1
2      Q.   Who got written up in your room?
3      A.   Do I have to give names?
4      Q.   It's the question, who got written up in
5  your room?
6      A.   Myself, Owen Miller, Rick Dyer.
7      Q.   What did you guys do?
8      A.   We were playing beer pong.
9      Q.   What role -- how was this an infraction
10  at Union?
11     A.   Supposed to be a substance free dorm.
12         I'm not sure of the specific rule.
13         Some sort of alcohol policy.
14     Q.   Did the policy regard underage drinking?
15     A.   I would assume so.
16     Q.   Were you underage?
17     A.   Yes.
18     Q.   Did you have a girlfriend at any time
19  during freshman year?
20     A.   Yes.
21     Q.   What is this girl's name?
22     A.   Griffin Makelsic (phonetic).
23     Q.   What is her address?
24     A.   I have no idea.
25     Q.   You don't know what her address is?

---

Page 129

Clorite

1
2      A.   She lives on 79th in my town, it's a
3  major road.  I don't know what number she is.  The
4  road runs through my town.  I don't know what number
5  she is.
6      Q.   Were you having problems with that
7  relationship during freshman year?
8      A.   The beginning of the year, yes.
9      Q.   Were you often upset about that
10  relationship during freshman year?
11     A.   To an extent.
12     Q.   Did that relationship end during freshman
13  year?
14     A.   Yes.
15     Q.   Looking again at Exhibit 3, turn to page
16  BC 0021, do you see that?
17     A.   Yes.
18     Q.   What is this document?
19     A.   My deposition of what happened that night
20  to the campus security department.
21     Q.   Did you see the first sentence you state
22  that your mother had just called?
23     A.   Uh-huh.
24     Q.   That was about two o'clock in the
25  morning?

---

33 (Pages 126 to 129)

**Page 180**

```
?
 d that the school
 en
 eel  t after
 adhering to the

 t mine.

 question.

 tion.
  there was a
 an you explain to
 ?
 rd or --

 s throughout the
 hree --

 e by one the
 matter of the

 aid there
```

**Page 181**

```
 bout two.

 r said that.
 one, whichever
 you tell me in
 all from it?
 n
 the --

 that one from
 onversations, I

 of them
 m before go for

 ndence via text,
 egarding me or
 gst you and your

 at happened in

 d back the
```

---

**Page 182**

```
 1           Clorite
 2   question.
 3        (Record read.)
 4        A.  Is that concerning the incident that
 5   happened in January?
 6        Q.  Concerning any incident, have you sent
 7   any e-mails or any other correspondence, written or
 8   electronic, between or amongst a friend or group of
 9   people --
10        A.  No.
11        Q.  -- regarding me?
12        There's been -- strike that.
13        MR. COLEMAN:  So incredibly vague, how
14   do expect him to answer a question like that?
15        Q.  Have you sent any e-mails referring to me
16   or with my name in it to anyone since our
17   altercation?
18        A.  No.
19        Q.  Prior and have you sent any?
20        A.  To friends or --
21        Q.  To anyone?
22        A.  I sent e-mails to deans, to --
23        Q.  Have you sent to any friends?
24        A.  No.
25        Q.  Before you said that you got your other
```

**Page 183**

```
 1           Clorite
 2   three points for drinking underage?
 3        A.  (Nodding head.)
 4        Q.  Is there any other time where you were
 5   drinking and got in trouble for it with the school?
 6        A.  Yes, spring term.
 7        Q.  What materialized from that?
 8        A.  Nothing, because it happened soon before
 9   I left school.
10        Q.  Did you drink on the night of the
11   altercation?
12        A.  No.
13        Q.  Did you drink any days surrounding the
14   altercation?
15        MR. COLEMAN:  Objection.  I don't
16   understand the question.  Spencer, if you get
17   your hand away from your mouth, maybe I can
18   understand the question.
19        MR. DREIER:  Can you repeat the question?
20        (Record read.)
21        A.  Define surrounding.
22        Q.  Were you not drunk or drinking -- strike
23   that.
24        Were you drunk or drinking on the 25th,
25   26th or 27th?
```

---



**Page 184**

```
 1           Clorite
 2        A.  No.
 3        MR. DREIER:  All right, that's all my
 4   questions.
 5        MR. COLEMAN:  Thank you.
 6
 7        (Time noted:  4:00 p.m.)
```

**Page 185**

```
 1
 2        A C K N O W L E D G M E N T
 3
 4   STATE OF NEW YORK )
 5             ) ss. :
 6   COUNTY OF       )
 7
 8        I,    BEN CLORITE      , hereby
 9   certify that I have read the transcript of my
10   testimony taken under oath in my deposition of
11   August 5, 2010; that the transcript is a
12   true, complete and correct record of my
13   testimony, and that the answers on the record
14   as given by me are true and correct.
15
16
            BEN CLORITE
17
18   Subscribed and sworn
19   to before me on this the
20      Day of      , 2010.
21
22
   Notary Public, State of New York
23
24
25
```

# EXHIBIT F

Christopher Rush

60

1    behind me.

2         Q.   Now, if you refer back up to the document

3    marked BC0079.

4                   MR. COLEMAN:  What's the exhibit number?

5                   MR. DREIER:  I don't have that.  I have

6    a Bates number.

7                   MR. COLEMAN:  It was identified at his

8    direct examination.

9         Q.   In any event, I'm identifying the page,

10   BC0079.

11                  MR. COLEMAN:  It's Exhibit C.

12        Q.   Do you have that, Chris?

13        A.   Yes.

14        Q.   Is it correct that your testimony is that you

15   abided by these codes of first-year housing?

16        A.   Yes.

17        Q.   Have you ever received any conduct points

18   from Union College?

19        A.   Yes.

20        Q.   How many points?

21        A.   Seven.

22        Q.   Seven?

23        A.   Yes.

24        Q.   What were they for?

Christopher Rush

61

1      A.    Drinking.

2      Q.    Were all of those points for drinking?

3      A.    Yes.

4      Q.    Now, if you look at the bulleted part, in the

5  fourth paragraph, do you see where it says, "Please

6  note"?

7      A.    Yes.

8      Q.    Could you read that out loud?

9      A.    "Please note, all of our first-year rooms are

10  considered substance free, no drinking, smoking, drugs,

11  et cetera.  Students preferring a more specific housing

12  designation regarding these things would want to

13  consider focus study housing."

14      Q.    Is it still your testimony that you abided by

15  these codes?

16      A.    Yes.

17      Q.    Are you aware that drinking is in violation

18  of these codes?

19      A.    Now I am, yes.

20      Q.    Would you like to revise your testimony?

21      A.    No, I did not follow all first-year housing

22  rules.

23      Q.    Were you incorrect in your original

24  testimony?

**74**

O. Miller

```
1          O. Miller
2      the deposition that he gave in this
3      case?
4   A    No, not about the details.  He just gave
5      it to me and he told me that he did the
6      deposition and it took two hours.
7   Q    Was there any further details that you
8      guys discussed?
9   A    No.
10  Q    Have you read the transcript of Chris
11     Rushe' deposition?
12         MR. COLEMAN:  Note my
13     objection.  Asked and answered.
14         Let's move forward.  You're
15     the one that has time constraints
16     you indicated.  You're repeating
17     your questions.
18  BY MR. DREIER:
19  Q    Owen, you're allowed to answer the
20     question still.
21  A    I think I already answered it.
22  Q    Can you please answer this question?
23  A    Um, I haven't.
24  Q    Did you and I ever have any contact
25     before we met at Union College?
```

**76**

O. Miller

```
1      during the time you and he were
2      suite-mates?
3   A    He was great.  Friendly, outgoing,
4      helpful, willing to do favors for me if
5      I was under time constraints, under
6      stress, whatever.
7      He was a very nice person.
8   Q    Was he generally a patient person?
9   A    Yeah.
10  Q    Did he exhibit, at times, what you would
11     construe as anxiety?
12  A    Of course.  Who doesn't?  We're at
13     college.  There's a lot of anxiety.
14  Q    Would you say that your temperament is
15     similar or different from Ben?
16  A    Than my temperament?
17  Q    Yeah.
18  A    I'm a different person from Ben.
19  Q    So different?
20  A    Yes.
21         MR. COLEMAN:  Spencer, let's
22     get to something relevant.  This
23     isn't a psychological test.
24         MR. DREIER:  Well --
```

**75**

O. Miller

```
1   A    Thankfully, no.
2   Q    Did you ever have any contact with Ben
3      Clorite before you met him at Union
4      College?
5   A    Yes.
6   Q    Did you ever have any contact with Chris
7      Rushe before you met him at Union
8      College?
9   A    Yes.
10     Not physical.  These were all social,
11     like, networking.
12  Q    For approximately how long did you share
13     a dorm suite with Ben Clorite at Union
14     College?
15  A    I don't know.  Um.  I don't know the
16     exact dates that he was there, wasn't
17     there.
18  Q    Approximately how long?
19  A    Um, less than a year.
20  Q    For approximately how long did you share
21     a dorm suite with me at Union College?
22  A    For fall term --
23     I mean, for freshman year.
24  Q    How would you describe Ben's temperament
```

**77**

O. Miller

```
1         MR. COLEMAN:  I'm not through
2      yet.  Spencer, I'm not through
3      yet.
4         I have an objection.  You've
5      got a witness who is subpoenaed
6      here and he's available for
7      cross-examination.  He's under
8      time constraints, as all of us
9      are, including you, so let's not
10     deal with psychological profiles,
11     please.  Ask him questions that
12     will educe facts.
13         MR. DREIER:  Jerry, thank you
14     for your --
15         MR. COLEMAN:  There's great
16     latitude here for you, but please
17     don't waste everyone's time.
18         MR. DREIER:  Thank you for
19     your legal advice, but please
20     refrain from giving it.
21  BY MR. DREIER:
22  Q    Owen, did you ever observe Ben drink
23     alcohol in our dorm suite?
24  A    Um, I don't see how that's relevant.
```

20  (Pages 74 to 77)

78

O. Miller

```
1
2    Q    Can you answer the question, please?
3    A    Yes.
4    Q    Yes, is that what you said?
5    A    Yup.
6    Q    Did you ever observe Ben smoking pot or
7         using cocaine in our dorm suite?
8    A    No.
9    Q    Did you ever witness him using any
10        recreation drugs at any point?
11   A    No.
12   Q    Did you ever drink alcohol or smoke pot
13        in our dorm suite at any point, or
14        anywhere on the campus?
15        MR. COLEMAN:  I'll object to
16             that.  You know, he's not on
17             trial here.  You know, he —
18             He can answer the question
19             if he wishes, but he's not on
20             trial here.
21        MR. DREIER:  Okay.
22   BY MR. DREIER:
23   Q    Owen?
24   A    I have consumed alcohol while on Union
25        College campus.  I'm a college kid.
```

79

O. Miller

```
1         I've watched you consume alcohol.
2    Q    That was not the question.
3         MR. COLEMAN:  Well, that's the
4             answer.  You asked for it and you
5             got it.
6    BY MR. DREIER:
7    Q    Did you ever observe Chris Rushe
8         drinking alcohol or smoking pot anywhere
9         on the campus?
10   A    Um, I've seen him drink some alcohol.
11   Q    Do you still room with Chris Rushe at
12        Union?
13   A    No.
14   Q    Please look in the exhibits in front of
15        you for what is marked Exhibit 1, at
16        Chris Rushe' deposition.  It's Bates
17        stamped 0025.  Mr. Coleman has already
18        produced it as an exhibit.
19   A    Yup.
20   Q    Do you have that in front of you?
21   A    Yes.
22        Yes, I do.
23   Q    Is that an e-mail that you sent to
24        Resident Advisor Joe Melendez at Union?
```

80

O. Miller

```
1    A    Apparently, yes.
2    Q    Please read the second paragraph to
3         yourself, which starts with the word
4         "honestly."
5    A    (Witness complied with request.)
6         Yup.  Read it.
7    Q    You read the second paragraph?
8    A    Yes.
9    Q    Does this e-mail summarize what you saw
10        as the problems relating to sharing a
11        dorm suite with me?
12   A    Yes.
13   Q    Did you complain in this e-mail that I
14        had a bad temper?
15   A    I'm pretty sure it doesn't state in here
16        that you have a bad temper.
17   Q    Did you complain in this e-mail that I
18        was physically aggressive?
19   A    I'm pretty sure the e-mail doesn't say
20        that you were physically aggressive.
21   Q    Did you complain in this e-mail that I
22        abuse people and I would verbally or
23        curse at them?
24   A    The e-mail says what it says.  I said
```

81

O. Miller

```
1         that you complained about the TV and
2         your time using it.
3    Q    Hold on.  Hold on.  Hold on.
4
5         MR. DREIER:  Can you read the
6             question back, please?
7         MR. COLEMAN:  I object.  The
8             e-mail states what it states.
9             It's already been examined upon.
10            It's been read into the record.
11            You know, I mean, what is your
12            question?  If you want to ask a
13            question, I mean, the e-mail
14            states what it states.
15        MR. DREIER:  Jerry, Jerry,
16            Jerry, please.
17        MR. COLEMAN:  Okay.
18        MR. DREIER:  I'm asking the
19            question.
20        THE WITNESS:  Okay.  I'll
21            answer it, Spencer.  Spencer, the
22            e-mail says what it says.
23        MR. DREIER:  Hold on.  Hold
24            on.
```

21  (Pages 78 to 81)



**106**

O. Miller

1
2  have.
3      MR. DREIER:  Hold it, Jerry.
4  I have, actually, two more
5  questions.
6      MR. COLEMAN:  Go ahead.
7      FURTHER EXAMINATION
8  BY MR. DREIER:
9  Q    Owen, did you testify at the Union
10  administrative hearing regarding the
11  claim that Ben and I had filed against
12  each other?
13  A    Yes.
14  Q    Did you hear me testify at the hearing?
15  A    For the portion that I was in the room,
16  yes.
17  Q    Tell me what, if anything, I testified
18  to that was not true.
19  A    That Chris Rushe was not intelligent.
20  Q    Is there anything else?
21  A    That's really the only thing I remember,
22  because you made that outburst and Molly
23  MacElroy yelled at you.
24  Q    Did Ben talk to you beforehand about
25  what he hoped or expected you might say

**108**

O. Miller

1
2  not "these points."
3      MR. DREIER:  Excuse me.
4  BY MR. DREIER:
5  Q    When did you receive this point?
6  A    Um, early in the fall.
7  Q    Of what year?
8  A    Um, freshman year.  I don't --
9  I don't remember.  I mean, I know I got
10  a point or something for alcohol.  I
11  don't remember the specific --
12  This is completely irrelevant to this
13  issue.  It wasn't --
14  You weren't even there.
15      MR. DREIER:  Okay.  Thank you.
16  I have no more questions.
17      MR. COLEMAN:  Nothing further.
18  Thank you very much, Owen, for
19  coming in.
20      THE WITNESS:  Thank you.
21  (Time Noted: 1:51 P.M.)
22
23
24
25

**107**

O. Miller

1
2  at the Union meeting?
3  A    No.
4  Q    Did you consider yourself a friend of
5  Ben's at the time of the hearing?
6  A    Sure.
7  Q    Have you ever received any conduct
8  points from Union College relating to
9  conduct during your freshman year?
10  A    No.
11      MR. DREIER:  All right.
12  A    And wait.  What do you mean by conduct
13  points?
14  Q    Any sanctions, any sanctions from Union.
15  Union runs --
16      MR. DREIER:  Strike that.
17  A    I haven't gotten any points for any --
18  any behavioral issues.
19  BY MR. DREIER:
20  Q    Have you gotten any points for any
21  reason whatsoever?
22  A    I got one point for having a beer in my
23  hand.
24  Q    And when did you receive these points?
25      MR. COLEMAN:  It was a point,

**109**

1
2  This is the Deposition of
3  OWEN MILLER
4  taken in the matter, on the date and at the
5  time and place set out on the title page hereof.
6
7  It was requested that the deposition be taken by
8  the reporter and that same be reduced to
9  typewritten form.
10
11  It was agreed by and between counsel and the
12  parties that the Deponent will read and sign the
13  transcript of said deposition.
14
15
16
17
18
19
20
21
22
23
24
25

28  (Pages 106 to 109)

# EXHIBIT G

Christopher Rush

13

1      Q.    If Ben did start a betting pool along these

2   lines, would you know about it?

3      A.    I -- Yes.

4      Q.    Is that because of a friendship that you have

5   with Ben?

6      A.    Yes.  Yes.

7      Q.    He was your roommate, correct?

8      A.    Yes.

9      Q.    Did Ben ever encourage you to throw a

10   newspaper at Spencer Dreier?

11      A.    No.

12      Q.    Did you?

13      A.    Yes.

14      Q.    And what was the occasion of that?

15      A.    I believe Owen Michael Miller and I had a

16   couple of friends over in the common room.  Spencer was

17   doing work in his room, I believe, and we were being

18   loud.  He went and got the RA and asked us to leave.

19   And, in my opinion, that was to make our lives

20   difficult.  I was at that point extremely frustrated

21   with him already.  And, as I was leaving, I tossed a

22   newspaper at his chest underhanded.

23      Q.    This didn't hurt him, I assume?

24      A.    No.

Christopher Rush

14

1    Q.    And where did it hit him?

2    A.    In the chest.

3    Q.    Did you ever witness Ben urging others to

4    harass Spencer Dreier?

5    A.    No.

6    Q.    So if Spencer Dreier testified that Ben

7    encouraged you and others to harass Spencer Dreier,

8    that statement would be untruthful, correct?

9    A.    Yes.

10   Q.    Spencer Dreier testified at his deposition

11   that he, quote, participated in the room and acted as a

12   good roommate to the best of my ability, closed quote.

13   Did he?

14   A.    No.

15   Q.    I show you a document of two pages previously

16   marked as Exhibit D which also has a Bates stamp in the

17   lower right-hand corner of BC0052 and the following

18   page BC0053.  And I want to ask you a few questions

19   about this.  Do you recognize this document?

20   A.    I do not.

21   Q.    Have you seen this document before?

22   A.    I don't believe so.

23   Q.    Let's go through certain things in this

24   document.  As you can see, it starts off saying, "The

Christopher Rush

65

1    blatant provocation.

2        Q.   Did Ben react to me physically?

3        A.   No, not that I was witness to.

4        Q.   Is it your understanding that he ever reacted

5    to me physically?

6        A.   Can you repeat that?

7              MR. DREIER:  Can you read it back?

8         (Record read.)

9        A.   Not from what I saw.

10       Q.   Is your understanding at all that he reacted

11   physically?

12             MR. DENAPOLI:  He answered the question.

13       A.   Not from what I saw.

14             MR. COLEMAN:  Objection.

15       A.   That's my understanding from what I saw.

16       Q.   Okay.  Thank you.  Have you ever spoken with

17   anyone about the blog?

18       A.   After it was written.

19       Q.   With whom did you speak about it?

20       A.   I don't recall, but it was people on the

21   third floor of Davidson.

22       Q.   And what did you guys say to each other?

23       A.   I don't recall.

24       Q.   On the incident we spoke about previously

Christopher Rush

66

1    where you threw a newspaper at me, why did you do this?

2         A.   I was frustrated.

3         Q.   With what?

4         A.   You.

5         Q.   In what way?

6         A.   Your actions, your lack of actions, your

7    attitude, your treatment of us, to name a few.

8         Q.   Did any of these encompass physical

9    interaction?

10        A.   What do you mean?

11        Q.   With me towards you.

12        A.   No.

13        Q.   Was your reaction physical?

14        A.   If you qualify a newspaper as physical.

15        Q.   Were you involved in offensive contact

16   towards me?

17        A.   No.

18             MR. DREIER:  I want to take a quick

19   five-minute break.  Is that okay?

20             MR. DENAPOLI:  A quick five-minute

21   break, is it going to be five minutes or is it going to

22   be quick?

23             MR. DREIER:  I'll call you back in five

24   minutes.

# EXHIBIT H

Christopher Rush

7

1    and Benjamin Clorite.  And I show you a copy of this

2    exhibit.  Do you recognize this exhibit?

3         A.   I do.

4         Q.   Did you receive this from Union College?

5         A.   I did.

6         Q.   Now, I direct your attention to the third

7    full paragraph which begins, "Please communicate with

8    each of your roommates in order to begin planning your

9    living space."  Do you see that?

10        A.   I do.

11        Q.   Did you receive any communication from

12   Spencer Dreier by telephone or e-mail prior to the

13   beginning of school?

14        A.   I did not.

15        Q.   I'd like you to also look at what I had

16   previously marked as Exhibit C which has also been

17   previously identified as BC0079 in the lower right-hand

18   corner.  And it is a document entitled "First-Year

19   Housing."  Do you see that?

20        A.   I do.

21        Q.   Now, there are four bullet points in the

22   center of the page.  And I will -- Why don't you read

23   these for us beginning with the sentence, "The

24   residential life staff"?

8

1    A.   "The residential life staff encourages all

2  students to be active community members building

3  positive and safe living and learning atmospheres

4  within the residence hall.  So what does that mean?  It

5  means you need to live with each other positively and

6  unselfishly.  It means you need to step out to interact

7  with your roommates and neighbors.  It means that

8  sometimes you won't get everything you want, and that's

9  okay.  It means that you need to be ready to learn and

10  grow from each other and be willing to let others grow

11  and learn from you."

12    Q.   Do you believe your roommates Ben and Owen

13  and you embraced and adhered to these qualities?

14    A.   I do.

15    Q.   Do you believe Spencer Dreier embraced and

16  adhered to these qualities?

17    A.   I do not.

18    Q.   Did Spencer Dreier state to you and your

19  roommates early in your relationship that he refused to

20  go to the library?

21    A.   He did.

22    Q.   And when was this?

23    A.   I believe it was the beginning of fall term,

24  and he decided to do work in the room instead.

10

O. Miller

1   November 9th, but has been
2   postponed by agreement of the
3   parties until today, and I have
4   sent this Subpoena as well to
5   Mr. Dreier.
6   BY MR. COLEMAN:
7   Q   Now Owen -- if I may call you Owen.
8   A   Uh-huh.
9   Q   Are you currently enrolled as a student
10  at Union College?
11  A   Yes.
12  Q   Please tell us the names of your
13  roommates for the 2008 and 2009 academic
14  year.
15  A   Ben Clorite, Chris Rushe and Spencer
16  Dreier.
17  Q   And what was the configuration of your
18  room?
19  Were you in what's known as a "quad"?
20  A   We were in a suite.
21       MR. DREIER: Objection. It's
22  a leading question, Jerry.
23  A   Well, I can answer it myself.
24       MR. COLEMAN: I note your

12

O. Miller

1   and it's a letter from Molly
2   MacElroy of Union regarding -- it
3   is dated August 4th, 2008,
4   regarding roommate assignments.
5   BY MR. COLEMAN:
6   Q   I ask you if you recognize that letter.
7   A   I believe so.
8   Q   I want to turn your attention
9   particularly to the third paragraph of
10  that letter.
11  A   (Witness reviewing document.)
12  This one?
13  Q   (Reading from Document)
14  Where it states, Please communicate with
15  each of your roommates in order to begin
16  planning your living space.
17  Did you receive any communication from
18  Spencer Dreier, by telephone or e-mail
19  or any other kind, prior to the
20  beginning of school?
21  A   No.
22  Q   Now, I show you another document that's
23  been previously marked as Exhibit C, and
24  is entitled First Year Housing.

11

O. Miller

1   objection.
2   Q   Go ahead.
3   A   It's a suite with four people living in
4   it.  There is a common room with two
5   doubles off either side.  I lived with
6   Chris Rushe, Ben Clorite and Spencer
7   Dreier for the better part -- half of
8   the year lived on the other side.
9   Q   How were you assigned roommates?
10  A   Randomly.  We filled out --
11  Randomly, but based on school-generated
12  assignments, which we filled out --
13  We filled out forms at the beginning of
14  the year outlining our tendencies,
15  sleeping pattern, study habits, what
16  kind of person we were, so they could
17  match us up accordingly with people who
18  were similar to us.
19  Q   I show you a document that was
20  previously marked as Exhibit B.
21       MR. COLEMAN: And I'll
22  identify it for the record for
23  you, Spencer.
24       It is Bates stamped BC0080,

13

O. Miller

1       MR. COLEMAN:  And it's Bates
2   stamped, Spencer, BC0079.
3   BY MR. COLEMAN:
4   Q   I show you this document.
5   A   (Witness reviewing document.)
6   Q   I direct your attention to the fifth
7   paragraph.
8   A   (Witness reviewing document.)
9   Q   (Reading from Document)
10  Where it states, The residential life
11  staff encourages all students to be
12  active community members, building
13  positive and safe living and learning
14  atmospheres within the residence halls.
15  So what does this mean?
16  And then there are four bullet points.
17       MR. DREIER:  Objection, Jerry.
18  You're asking him to draw
19  conclusions.  He's a material
20  witness.
21       MR. COLEMAN:  I have no idea
22  what you just said, Spencer.  I
23  just can't make that out.  Would
24  you repeat that.

4  (Pages 10 to 13)

14

O. Miller

1
2  MR. DREIER: I objected. I
3  said your question is asking him
4  to state a conclusion. He's a
5  material witness. Would you ask
6  him a question.
7  MR. COLEMAN: I don't
8  understand or respect that
9  objection. It doesn't make any
10 sense to me.
11 I'm asking a question, I'm
12 asking the witness questions and
13 I want his answers to my
14 questions.
15 MR. DREIER: Jerry, Jerry, the
16 question asked him to draw a
17 conclusion. He's a material
18 witness. You have to ask him
19 fact questions. I'm objecting on
20 those grounds.
21 MR. COLEMAN: Your objection
22 is noted for whatever purpose or
23 use it is, and the witness is
24 going to answer the question.
25

15

O. Miller

1
2  BY MR. COLEMAN:
3  Q   The questions are –
4  MR. COLEMAN: Withdrawn.
5  BY MR. COLEMAN:
6  Q   (Reading from Document)
7  The statements are, It means you need to
8  live with each other positively and
9  selfishly.
10 Do you believe that Ben and Owen
11 embraced and adhered to these
12 qualities – I'm sorry, Ben and Chris
13 embraced and adhered to these qualities
14 as roommates?
15 MR. DREIER: Objection. It's
16 a leading question.
17 A   Yes.
18 Q   Do you believe that Spencer Dreier
19 embraced and adhered to these qualities?
20 A   No.
21 Q   (Reading from Document)
22 The second bullet point states, It means
23 you need to step out to interact with
24 your roommate and neighbors.
25 Do you believe your roommates, Ben and

16

O. Miller

1
2  Chris, embraced and adhered to these
3  qualities?
4  A   Yes.
5  Q   Do you believe Spencer Dreier embraced
6  and adhered to these qualities?
7  A   Less so.
8  Q   (Reading from Document)
9  The third bullet point states, It means
10 that sometimes you won't get everything
11 you want and that's okay. Do you
12 believe your roommates, Ben and Chris,
13 embraced and adhered to these qualities?
14 A   Yes.
15 Q   Do you believe Spencer Dreier embraced
16 and adhered to these qualities?
17 A   No.
18 Q   (Reading from Document)
19 The fourth bullet point states, It means
20 that you need to be ready to learn and
21 grow from each other and be willing to
22 let others learn and grow from you.
23 Do you believe your roommates, Ben and
24 Chris, embraced and adhered to these
25 qualities?

17

O. Miller

1
2  A   Yes.
3  Q   Do you believe Spencer Dreier embraced
4  and adhered to these qualities?
5  MR. DREIER: Objection, Jerry.
6  This whole line of questioning is
7  asking him to draw conclusions
8  not to state facts. Objection.
9  MR. COLEMAN: These are
10 factual inquiries and he's giving
11 me factual answers. I would
12 appreciate if you have an
13 objection it's a proper
14 objection, otherwise you're going
15 to continue to delay this
16 proceeding.
17 MR. DREIER: Jerry, I'm --
18 MR. COLEMAN: Whatever your
19 objection –
20 I'm sorry, go ahead.
21 MR. DREIER: I'm objecting and
22 my objection should be noted at
23 face value and we can move on.
24 You can ask more questions if you
25 like.

5 (Pages 14 to 17)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123  (212)705-8585

# EXHIBIT I

61

1     A.   Drinking.

2     Q.   Were all of those points for drinking?

3     A.   Yes.

4     Q.   Now, if you look at the bulleted part, in the

5  fourth paragraph, do you see where it says, "Please

6  note"?

7     A.   Yes.

8     Q.   Could you read that out loud?

9     A.   "Please note, all of our first-year rooms are

10  considered substance free, no drinking, smoking, drugs,

11  et cetera.  Students preferring a more specific housing

12  designation regarding these things would want to

13  consider focus study housing."

14     Q.   Is it still your testimony that you abided by

15  these codes?

16     A.   Yes.

17     Q.   Are you aware that drinking is in violation

18  of these codes?

19     A.   Now I am, yes.

20     Q.   Would you like to revise your testimony?

21     A.   No, I did not follow all first-year housing

22  rules.

23     Q.   Were you incorrect in your original

24  testimony?



Christopher Rush

62

1      A.   Yes.

2                MR. COLEMAN:  You know, I'd like to

3      clarify.

4                MR. DREIER:  Hold on.

5                MR. COLEMAN:  I'm speaking.  Don't tell

6      me to hold on.  I'm speaking, please.  Let me finish.

7      I want to clarify for the record he was not examined as

8      to his embracing and adhering to everything on this

9      page.

10               MR. DREIER:  This is not your --

11               MR. COLEMAN:  I am not through yet.

12               MR. DREIER:  Mr. Coleman, please reserve

13     what you're saying.

14               MR. COLEMAN:  I am not through yet, sir.

15               MR. DREIER:  Mr. Coleman, lower your

16     voice.

17               MR. COLEMAN:  Spencer, I'm speaking.

18     Please do not interrupt me.  You will have an

19     opportunity to respond.  I asked him specifically and

20     solely about the four bullet points under residential

21     life staff.  That was the only element of questioning

22     on this document.  You have bastardized his testimony

23     to fit your preconceived notions of what he said about

24     this, adhering to this entire document, and you are

# EXHIBIT J

 **UNION**
C O L L E G E
Founded 1795



Office of the Dean of Students                                                       518-388-6116
Reamer Campus Center                                                                 518-388-6061
807 Union Street                                                                Fax: 518-388-6648
Schenectady, NY 12308

May 22, 2009

Ben Clorite
37 Whedon Lane
Madison, CT 06443-2925

Dear Ben:

I am writing this letter as a follow-up to the decision reached yesterday that you would immediately commence a voluntary withdrawal from Union College. As a condition of this withdrawal we agreed that we would process no additional disciplinary action at this time. I will ask the Committee on Standing not to consider academic suspension either. Your transcript will record a "withdrawal" during spring term, with "W" (for withdrawal) listed by each of your courses. By college policy, a withdrawal at this point in the term entails no refund.

You are eligible to petition to return to Union beginning Winter Term 2010. The procedure for your petitioning to return will be that you are to notify me in writing (email is fine) of your intention to return. Your return will be subject to my sense of assurance that you will be willing to follow the directives of my office and the office of Residential Life. You will also be on probation, given your 8 disciplinary points, so any further violation will risk suspension. These terms are important as a safeguard to the community.

You are currently not a student and therefore are not to return to Union's campus or any of its interests without prior consent from Campus Safety and my office.

Sincerely yours,

Stephen C. Leavitt
Vice President for Student Affairs
and Dean of Students

CC:    Chris Hayen
       Mr. and Mrs. William Clorite

# EXHIBIT K

1

2      on board the yacht and directed they not follow the

3      receiver's instructions an not bring the yacht  to

4      the U-S.

5           Q.    Do you see that?

6           A.    Yeah.

7           Q.    Is that an inaccurate representation by

8      Mr. Streeter to the judge?

9           A.    Its its not true.  Its not the case.

10          Q.    You said its not true its not the case,

11     is that what you said?

12          A.    Its not the case.

13          Q.    Please,

14          Q.    Please keep hands away your mouth, I

15     really can't understand you have you hand in front

16     of your mouth testifying.

17          Q.    All right I am sorry I know this is

18     probably a habit have you its just -- it procedure

19     some since I can't understand what you're saying?

20          A.    All right I'd say it again.

21          Q.    Thank you I appreciate it?

22          A.    What I am saying, is that that its not

23     the case.

24          Q.    Why do you believe that Mr. Streeter

25     would make this representation to the judge if its

1
2      not the case?

3           A.     Maybe at the time he thought it was the

4      case.

5           Q.     What facts did he have to base this

6      statement upon, if you know?

7           A.     I've never spoken to him, and he's

8      attorney, I don't know.

9           Q.     You never spoken to Mr. Streeter?

10          A.     Not that I recall.

11          Q.     Going further, Mr. Streeter states to the

12     judge in short Spencer Dreier is not even a

13     responsible person let alone a financially

14     responsible person and he cannot be trusted to

15     follow this court's orders.

16          Q.     Why do you believe that Mr. Street are

17     stated to the judge that you were not a responsible

18     person?

19          A.     Well probably because he believed the

20     stuff above, but we already established that --

21     reality might have been different.

22          Q.     Now searching your memory, and hopefully

23     this discussion would resurrect  or recollect some

24     of your memory, again, did you have any discussions,

25     either by phone or in person, with any

1

2      representatives of the U-S attorney a office, other

3      than what you've testified to here this morning?

4           A.     Not that I recall.

5           Q.     Now, you have testified that you received

6      any number of documents from the U-S attorney's

7      office.  Where are those documents now?

8           A.     I have no idea.

9           A.     Didn't keep them.

10          Q.     You threw them away?

11          A.     No.  I didn't keep them.  I I go to

12     college, some things are moved around in my room

13     when I come back.  I haven't scene them recently.

14          Q.     Well, I'd like to leave's space in the

15     record, and direct to you review your documents and

16     if you fine these documents to produce them.  As

17     part of this deposition.

18          A.     Okay

19     TO BE FURNISHED:

20          Q.     Now, do you have anyone advising you or

21     counseling you regarding this ongoing litigation?

22          A.     I've asked people for advice.

23          Q.     Who?

24          A.     Various lawyers.

25          Q.     What are there names?

```
 1
 2        A.    I've mentioned this case to my employer,
 3   who I stated before, and -- its actually really --
 4   the only law that's the last lawyer I've spoken to
 5   about it.  I don't remember anyone else in
 6   particular, but.
 7        Q.    You just testified that you spoken with
 8   various lawyers about it.  You've only identified
 9   Mr. Roth who are the other various lawyers that you
10   spoke to about this case?
11        A.    I am reflecting I said various --  I
12   don't I am sure at some point I asked other people,
13   I don't remember asking any or people this time no
14   any other lawyers.
15        Q.    Is your father advising you regarding the
16   conduct of this suit?
17        A.    He's my father.  He's involved in my
18   life.
19        Q.    Can you answer the question please.
20        A.    I did.
21        Q.    No, u didn't
22        Q.    I want a specific answer to my specific
23   question.
24        A.    I have spoken about the case with my
25   father, yes.
```

40

```
1
2        Q.    Have you had any contact with Gerald
3    Shargel since filing this lawsuit?
4        A.    I haven't spoken with him.
5        Q.    Have you had any or contact with him?
6        A.    No.
7        Q.    When is the last time you spoke with him?
8        A.    About -- a year ago.  A year and a half
9    -- I don't know.  A while.
10       Q.    What was the topic of that conversation?
11       A.    I have no idea.
12       Q.    Did you call him, or did he call you?
13       A.    I don't know if its way phone
14   call.  Could have been in person.  I mean I I met
15   Gerry  several times.
16       Q.    I know you've met him several times, I
17   just asked what the last contact with him --
18       A.    It wasn't a memorable contact.
19       Q.    Have you had any contact with richard
20   strausberg since filing this lawsuit?
21       A.    I don't even know who that is.
22       Q.    Did you have any attorney representing
23   you or acting on your behalf during all the
24   proceedings surrounding your father's prosecution
25       A.    Not to my knowledge.
```

1

2         Q.    Did you attempt to retain counsel to

3    represent you in this proceeding?

4         A.    Yes.

5         Q.    Who was that?

6         A.    The same person, I spoke with, richard

7    Roth about possibly doing that.

8         Q.    When was that?

9         A.    I don't recall the exact date.

10        Q.    Well, was it 6 months ago or a week ago?

11        A.    Within -- within the last 6 months I've

12   spoken to him about the case an about retaining him.

13        Q.    What was his response?

14        A.    What was his response?

15        Q.    Right.

16        A.    Protected when you go talk to a lawyer

17   about retaining him, its privileged information.

18        Q.    But he is not representing you, is that

19   correct?

20        A.    Not at this juncture.

21        Q.    Other than Mr. Roth, did you ask anyone

22   else any or attorney, to represent you regarding

23   this lawsuit?

24        A.    Not to my knowledge.

25        Q.    Why is that?

1

2          A.    Why did I not -- seek an attorney?

3          Q.    Yes.

4          A.    I decided to do it myself.

5          Q.    What do you base that upon?

6          A.    I don't think I need to justify my

7    feeling.  Its a feeling.

8          Q.    Its a question, I need to get an answer

9    from you.  Why do you feel can you represent

10   yourself in this case an you don't need an attorney?

11         A.    I don't know.  I just feel like that.

12         Q.    Feel like what?

13         A.    I feel like I can.

14         Q.    Based upon what, what are your cap bill

15   tease to represent yourself in a court of law?

16         A.    Everyone has the opportunity to represent

17   themselves pr se.   I have elected that opportunity.

18    Why   why does anyone feel they can represent

19   themselves pro se,  they feel that they can.

20         Q.    What is the basis for your thinking that

21   can you represent yourself?

22         A.    I don't know.  Again I just feel that I

23   can.

24         Q.    Do you feel come attention to represent

25   yourself in a proceeding like this?

1

2          A.     I feel that I can manage it.  Its just my

3     feeling.  Can't put my finger on any particular

4     thing.

5          Q.     Again, just do wrap this up, at any time

6     did anyone inform you that if you took certain

7     actions regarding your father, your father's

8     property or the firm's property, that you would be

9     charged with a crime?

10         A.     I don't know the terminology they used by

11    I said before is that they suggested that it my best

12    interests to not be involved with -- assets and

13    things dealing with my father.

14         Q.     Now, I want to refer you back to the

15    discipline air committee hearing at union.

16         Q.     Do you remember that day of the hearing?

17         A.     I remember.

18         Q.     The panel proceeding.

19         Q.     How long did the proceeding last?

20         A.     Two hours.  An hour.  I don't know.

21         Q.     Who was on the panel?

22         A.     I actually don't know.  I don't remember.

23         A.     Various deans, and -- I think was like

24    maybe two deans and faculty members something like

25    that.

1

2          A.     I don't know the but can you look that up

3     there's a date there.

4          Q.     Is it April or may?

5          A.     Waste there for a few -- for a few couple

6     of -- a few weeks into the term

7          Q.     Was this after the panel administrative

8     panel meeting?

9          A.     I want to -- I want to I want to say

10    before but I can't recall for sure.

11         A.     I'm not sure.

12         Q.     All right.  I'm just trying to get some

13    clarity here.

14         Q.     How did it come about that had you a

15    discussion with Dean Leavitt about your leaving

16    union?

17         A.     Dean Williams an Dean Leavitt an I, all 3

18    of us, I don't know I don't know how much they

19    corresponded with each other but I had spoke to both

20    of them separately several times, over the year,

21    especially what situation arose  physical, the most

22    -- sorry once the situation that we're is the

23    physical situation we're talking about arose  is

24    when -- our conversations became more frequent, but

25    there had been conversations because of other

1

2      instances with Ben an I, previous.

3            A.      To this last -- previous to January.

4            Q.      When did leavitt encourage you to stay at

5      union?

6            A.      In the -- in the spring term when I came

7      back an I told him that I think that I have to leave

8      given the circumstances, and he said that he could

9      encourage any union student to stay, that he hates

10     seeing someone that   --   admitted to the school

11     leave but if I truly feel that -- the environment is

12     -- detrimental to me, then I should do what I think

13     is best for me.

14           A.      That's approximate account.

15           Q.      At any time did Dean Leavitt say to you

16     that it would be in your best interests to leave the

17     school?

18           A.      No.

19           Q.      At any time did Trish Williams say it

20     would be in your best interests to leave union?

21           A.      No.

22           Q.      Did you discuss leaving union with Trish

23     Williams?

24           A.      I when I told her that was going to do

25     it, we had a discussion.

70

1

2          Q.     When you say them, I am talking about

3     your discussions with Trish Williams not with anyone

4     else?

5          A.     Dean leavitt an Trish Williams we had

6     there offices adjacent to each other so I sometimes

7     just shut back an forth, so I probably had a

8     conversation at the same moment when I notified them

9     about the fact that for the reasons I said why I

10    was going to leave.

11         Q.     when did you notify them, let me ask you

12    that?

13         A.     Very beginning of spring term.

14         Q.     Was it after the hearing?

15         A.     You asked me that before I said I I I

16    felt it was before but I am not sure.

17         A.     Do you know the date of hearing?  Sorry.

18         Q.     It was the first week in April.

19         A.     You done know when spring term begins?

20         Q.     I'm not a student, I don't know when it

21    begins.  When your student --

22         A.     I am not certain there I never I.

23         Q.     You never been to spring term your the

24    student.  I mean?

25         A.     I don't go there.

# EXHIBIT L

1

2          A.     I feel that I can manage it.  Its just my

3     feeling.  Can't put my finger on any particular

4     thing.

5          Q.     Again, just do wrap this up, at any time

6     did anyone inform you that if you took certain

7     actions regarding your father, your father's

8     property or the firm's property, that you would be

9     charged with a crime?

10         A.     I don't know the terminology they used by

11    I said before is that they suggested that it my best

12    interests to not be involved with -- assets and

13    things dealing with my father.

14         Q.     Now, I want to refer you back to the

15    discipline air committee hearing at union.

16         Q.     Do you remember that day of the hearing?

17         A.     I remember.

18         Q.     The panel proceeding.

19         Q.     How long did the proceeding last?

20         A.     Two hours.  An hour.  I don't know.

21         Q.     Who was on the panel?

22         A.     I actually don't know.  I don't remember.

23         A.     Various deans, and -- I think was like

24    maybe two deans and faculty members something like

25    that.

44

1

2      Q.      How many were on it, thousand?

3      A.      Between 3 an five.  I don't remember.

4      Q.      Did any of these panel members take an

5   active role in questioning witnesses?

6      A.      Not that I remember.

7      Q.      Prior to testifying, were witnesses

8   required to take an oath of truth full necessary?

9      A.      I presume.  I don't remember exactly, but

10  I think there were obliged to school rules to tell

11  the truth.

12     Q.      Well did they raise there right hand and

13  promise to tell the truth the whole truthful an

14  nothing but the truthful, such as you did this

15  morning?

16     A.      I don't recall.

17     Q.      Did anyone testify on your behalf?

18     A.      You want to know who I called as a

19  witness?

20     Q.      Yeah.

21     A.      I think I remember calling -- Brooke

22  donaly.  As a witness?

23     A.      An then there were several witnesses who

24  we both called the R-A, we both called Joe melendez

25  and -- I mean I think that's it.

## CERTIFICATE OF SERVICE

_EDRc_ , an individual over 18 years of age, certifies that on

June 23, 2012 she caused the within Plaintiff's Memorandum in Opposition to

Defendant's Motions in Limine to be served by hand upon:


Jerome Coleman, Esq.
Putney Twombly Hall & Hirson LLP
521 Fifth Avenue
New York, NY, 10175USA


I certify that the foregoing is true and correct under penalty of perjury, pursuant to

28 U.S.C. 1746.


Executed on June 23, 2012
New York, NY 10022

_EDRc_